2015-1314

IN THE

# United States Court of Appeals
# for the Federal Circuit

CUTSFORTH, INC.,

Appellant,

v.

MOTIVEPOWER, INC.,

Appellee.

Appeal from the United States Patent and
Trademark Office, Patent Trial and Appeal
Board in No. IPR2013-00268.

**BRIEF OF APPELLANT CUTSFORTH, INC.**

Mathias W. Samuel
Robert Courtney
Conrad Gosen
FISH & RICHARDSON P.C.
3200 RBC Plaza, 60 South 6th St.
Minneapolis, MN 55402
Telephone: 612-335-5070

April 7, 2015                    *Attorneys for Appellant*

## **CERTIFICATE OF INTEREST**

Counsel for the Appellant Cutsforth, Inc. certifies the following:

- The full name of every party or amicus represented by me is:

Cutsforth, Inc.

- The name of the real party in interest represented by me is:

N/A

- All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus cu-riae represented by me are:

Cutsforth, Inc. has no parent company and no other publicly held company owns 10% or more of Cutsforth, Inc.'s stock.

- The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Fish & Richardson P.C.: Mathias W. Samuel, W. Karl Renner, Dorothy P. Whelan, Robert Courtney, Joseph Herriges, Conrad Gosen

Date: April 7, 2015                    */s/ Mathias W. Samuel*
                                        Signature of counsel

                                        Mathias W. Samuel
                                        Printed name of counsel

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........................................................................i

STATEMENT OF RELATED CASES ...................................................... 1

STATEMENT OF JURISDICTION ........................................................ 1

STATEMENT OF THE ISSUES ............................................................. 1

STATEMENT OF THE CASE ................................................................. 2

INTRODUCTION .................................................................................. 3

STATEMENT OF THE FACTS ............................................................. 4

    A.    Background ............................................................... 4

    B.    The '906 Patent ....................................................... 8

    C.    The Present IPR ..................................................... 13

        1.    The Krulls patent ............................................. 14

        2.    The Ohmstedt patent ....................................... 15

SUMMARY OF THE ARGUMENT ...................................................... 16

STANDARD OF REVIEW .................................................................... 18

ARGUMENT ........................................................................................ 19

I.    THE BOARD MISAPPLIED THE BROADEST
    REASONABLE INTERPRETATION STANDARD,
    CONSTRUING CLAIMS FAR BEYOND ANY REASONABLE
    MEANING .................................................................................. 20

A.    The Board Improperly Read "projection extending from" to Cover a Structure Recessed Into Another Structure ..........................................................................21

B.    The Board's Interpretation of Claim 19's "brush catch includes a spring" Requirement was Facially Unreasonable ....................................................................27

C.    The Board Misconstrued "beam" to Cover Structures That Are Not Rigid and Not Relatively Long and Thin—Both Part of the Ordinary Meaning of the Term....................................................................29

      1.    The '906 specification universally supports reasonable limits on the term "beam" ........................32

      2.    Unrebutted evidence demonstrated that, in the field, "beams" are known to be both straight and rigid.................................................................36

D.    The Board Misconstrued "brush catch coupled to the beam"........................................................................39

      1.    The claims require a particular "coupled" relationship ..........................................................40

      2.    The written description uniformly distinguishes the "beam" and "brush catch" ............43

      3.    Unrebutted extrinsic evidence confirmed that one of skill would understand "brush catch coupled to the beam" to require different physical structures...........................................46

      4.    Nothing in the claims or specification supports extending the claims over "sub-components" ...........................................................47

II.    THE PTAB'S ANTICIPATION DETERMINATION CANNOT
STAND WITH THE CLAIMS PROPERLY INTERPRETED...............49

    A.    The Claims are Novel over Krulls ...............................................49

        1.    Krulls does not teach the "beam" required
by all claims............................................................................50

        2.    Krulls does not teach the "brush catch
coupled to the beam" required by all claims............53

    B.    The Claims are Novel over Ohmstedt ....................................56

        1.    Ohmstedt does not teach a "brush release
[that] is a projection extending from the
mounting block" required by all claims
under review..........................................................................57

        2.    Ohmstedt does not teach that the "brush
catch includes a spring," as required by '906
claim 19...................................................................................58

        3.    Ohmstedt does not teach the "beam"
required by all claims........................................................61

III.    REVERSAL IS WARRANTED ....................................................................63

CONCLUSION.............................................................................................................65

# TABLE OF AUTHORITIES

**Cases**

*Apple Inc. v. Motorola, Inc.,*
    757 F.3d 1286 (Fed. Cir. 2014) ................................................................ 42

*Becton, Dickinson & Co. v. Tyco Healthcare Grp.,*
    616 F.3d 1249 (Fed. Cir. 2010) ................................................. 42, 50, 57

*Dickinson v. Zurko,*
    527 U.S. 150 (1999) ...................................................................................... 19

*In re Abbott Diabetes Care Inc.,*
    696 F.3d 1142 (Fed. Cir. 2012) .................................................. 21, 27, 50

*In re Am. Acad. of Sci. Tech. Ctr.,*
    367 F.3d 1359 (Fed. Cir. 2004) ............................................................. 20

*In re Baker Hughes, Inc.,*
    215 F.3d 1297 (Fed. Cir. 2000) ............................................................. 67

*In re Buszard,*
    504 F.3d 1364 (Fed. Cir. 2007) .................................................. 22, 27, 37

*In re Cuozzo Speed Techs., LLC,*
    778 F.3d 1271 (Fed. Cir. 2015) ................................................. 20, 43, 67

*In re Donaldson Co.,*
    16 F.3d 1189 (Fed. Cir. 1994) (en banc) ............................................. 18

*In re Gartside,*
    203 F.3d 1305 (Fed. Cir. 2000) ............................................................. 19

*In re Morris,*
    127 F.3d 1048 (Fed. Cir. 1997) ............................................................. 32

*In re Morsa,*
    713 F.3d 104 (Fed. Cir. 2013) ............................................................... 18

*In re NTP, Inc.*,
    654 F.3d 1279 (Fed. Cir. 2011) ........................................................21, 50

*Leo Pharm. Prods., Ltd. v. Rea*,
    726 F.3d 1346 (Fed. Cir. 2013) ................................................................39

*Merck & Co. v. Teva Pharms. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005) ................................................................42

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2006) (en banc) ............................................39

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015) ..................................................................................19

*Toro Co. v. White Consol. Indus., Inc.*,
    199 F.3d 1295 (Fed. Cir. 1999) ................................................................40

**Regulations**

37 C.F.R. § 42.100(b) ........................................................................................20

## STATEMENT OF RELATED CASES

No other appeal in or from this case has been before either this Court or any other appellate court. Counsel is aware of the following case, pending in another court, which will be directly affected by this Court's decision in the pending appeal: *Cutsforth, Inc. v. LEMM Liquidating Co.*, No. 12-cv-1200 (D. Minn. filed May 17, 2012). Two appeals currently pending before this Court involve patents related to the patent in this appeal: *Cutsforth, Inc. v. MotivePower, Inc.*, No. 15-1315 (docketed Feb. 6, 2015), and *Cutsforth, Inc. v. MotivePower, Inc.*, No. 15-1316 (docketed Feb. 6, 2015).

## STATEMENT OF JURISDICTION

This Court's jurisdiction over this appeal is governed by 28 U.S.C. § 1295(a)(4)(A). Pursuant to Rule 28(a)(5), Cutsforth represents that the judgment appealed from is final.

## STATEMENT OF THE ISSUES

This appeal concerns two issues:

1.      Did the PTAB err in finding claims 14, 16-19, 21, and 22 of U.S. Patent 7,141,906 anticipated by U.S. Patent 3,864,803 to Ohmstedt?

2.    Did the PTAB err in finding claims 14, 16-19, 21, and 22 of the '906 patent anticipated by U.S. Patent 3,387,155 to Krulls?

## STATEMENT OF THE CASE

On May 17, 2012, Appellant Cutsforth, Inc. filed suit for patent infringement in the United States District Court for the District of Minnesota against Fulmer Company LLC and Westinghouse Air Brake Technologies Corporation.[1]  Compl., *Cutsforth, Inc. v. LEMM Liquidating Co.*, No. 12-cv-1200 (D. Minn. May 17, 2012), ECF No. 1. Cutsforth subsequently named Appellee MotivePower, Inc. as an additional defendant.  2d Am. Compl., *LEMM Liquidating* (D. Minn. Sept. 25, 2012), ECF No. 45.  Among other claims, Cutsforth seeks damages caused by Appellee's infringement of U.S. Patent 7,141,906 (filed June 30, 2005). *See* '906 patent, A21-54.  The case is before Judge Susan Richard Nelson.

On May 6, 2013, MotivePower petitioned for IPR of the '906 patent.  A59.  The district court has stayed litigation pending resolution

---

[1] Fulmer Company LLC later changed its name to LEMM Liquidating Company, LLC.

of the IPR.[2]  Order, *LEMM Liquidating* (D. Minn. June 6, 2013), ECF No. 88.

On November 1, 2013, the PTAB instituted IPR.  Institution Decision, A254-73.  After briefing and oral argument, on October 30, 2014, the Board found claims 14, 16-19, 21, and 22 anticipated by two references: "Ohmstedt" and "Krulls."  Final Decision ("Dec."), A1-20.  Cutsforth timely appealed.

### INTRODUCTION

This is an appeal from anticipation rejections in an IPR.  The '906 patent relates to a removable brush holder—a device that holds a block of carbon (a "brush") against the fast-rotating shaft of an electric turbine, while enabling safe and quick replacement of worn brushes.  The relevant claims recite a "mounting block" and a "beam" that have complementary "engagement portion[s]," that are "slidably engaged" and "slidable" from "disengaged" and "engaged" positions.  They also recite a "brush release" that "is a projection extending from the mounting block" and that has "sliding engagement with [a] brush catch."  By these explicitly-recited structures, the brush holder is able

---

[2] The district court extended the stay until the appeal is over.  Order, *LEMM Liquidating* (D. Minn. Jan. 15, 2015), ECF No. 98.

3

to hold the brush solidly when it is locked in place, and be easily removed when it is unlocked.

This appeal raises the PTAB's errors in making and applying claim constructions, and in particular, reading out of the claims requirements that are express in the claim language, including:

- Holding that "projection extending from" covers a structure that sinks **into** another structure, and does not project or extend from the other structure;

- Holding that the phrase "the brush catch includes" imposes no requirement that the "brush catch" actually include anything;

- Holding that a "beam" has no requirement of rigidity or other shape or function; and

- Holding that two elements recited as being "coupled" do not need to be coupled to one another.

With the proper broadest reasonable interpretations applied, there is no real dispute that the cited references do not anticipate.

## STATEMENT OF THE FACTS

### A.    Background

Cutsforth is a family-owned Minnesota company that sells parts and services for large electric turbines used by utility companies.

Turbines generate electricity by rotating a shaft under force from a fluid, like wind, water, or steam created from nuclear fission or burning gas or coal.  The shaft has electric current flowing in it, and the electric current transforms the shaft into an electromagnet.  When rotated, the electromagnetic field induces electric current to flow in wires surrounding the shaft.  The trick is to complete an electric circuit to the shaft without being able to literally connect to the shaft (because it is constantly rotating).  Generators traditionally performed such a function by pressing copper wire brushes against the rotating shaft, and today they use carbon blocks that are pressed on, and rub against, the shaft[3]—though the blocks are still called "brushes" because of the historic connection.

The products here are removable brush holders.  Relevant to this appeal, a brush holder must do three things well: (1) hold the carbon block securely in contact with the rapidly-moving shaft, even as the contact surface becomes pitted and uneven,[4] (2) allow quick and easy

_____

[3] Technically, the brushes contact a pair of "collector rings" that are positioned at one end of the shaft and rotate with the shaft.

[4] The dangers and technical challenges surrounding such wear and tear are substantial.  Shafts generally turn at around 3,600 rpm, comparable to the rate of a tool-shop bench grinder.  Accidental or imprecise contact could have serious consequences, including arcing

replacement of a worn brush that may be hard to reach and is on a turbine that is spinning, and (3) retain the brush within the holder during the replacement process.  Finally, safety is a top priority. Accidental contact with energized components can create a serious shock hazard for workers.  Thus, best practices impose the "one hand" rule.  Workers limit contact with any energized part of a generator— including the parts concerned with brush holder replacement—to one hand, so as to avoid forming a circuit through the worker's body.  *See* Keim Decl. ¶¶ 46-51, A538-43.

---

and "flashover"—i.e., sparks jumping a gap between shaft and brush— posing serious safety risks and potentially damaging equipment.  *See* Keim Decl. ¶¶ 31-32, A527-29; *see also* Cutsforth Arcing Video, A345.

The '906 patent addresses Cutsforth's flagship product—the EASYchange® Removable Carbon Brush Holder, which has a "mount block" and a removable "brush holder" that locks to the block.[5]



When the turbine is off (typically during a scheduled maintenance period), the mounting block can be anchored to the turbine via bolts passed through slots in the mount block. The brush holder slides on

---

[5] Cutsforth markets the EASYchange as an effective and safe tool for brush replacement that avoids the costs and risks arising when brushes become stuck or improperly-secured in a turbine housing. *See, e.g.*, Cutsforth Inc., *Feeling stuck with your brush holders?*, VIMEO.COM, http://vimeo.com/36990501 (last visited Mar. 23, 2015) (video depicting EASYchange in use).

and off the mount block, and locks onto it via movement of the black handle shown above.

### B.    The '906 Patent

Cutsforth has patented its innovative brush holders. The '906 patent is one example. Figure 1 of the '906 patent shows the mounting block 16 (colored green), which is bolted to the generator housing (not shown). In this figure, a brush holder is engaged with the mounting block. The brush holder includes a beam 14 (colored blue), to which is mounted a brush box 10 that surrounds the brush 12 (colored gray). *See* '906 patent at 4:21-30, A45. When fully installed, the brush holder will hold the brush in the proper alignment to the spinning shaft (on the left), and spring 24 will bias the brush into the shaft.



*Fig.1*

*Id.* fig.1, A22.

Figures 4A and 4B show the beam 14 in isolation, attached to a curled spring 54 (depicted in Figure 1 as 24), where the tension of the spring pushes against the carbon block's top to keep the block in contact with the rotating shaft, even as it wears down. *Id.* at 7:43-46, A47. As can be seen, beam 14 is solidly built, with a generally "C-beam" type structure.



*Id.* figs.4A, 4B, A25-26.

The action by which the brush holder can be removed "on-the-fly" can be seen by comparing figure 1 above, where the brush holder is in an engaged position, to figure 2 below, where it is snapped up and disengaged—ready to be removed.



*Id.* at fig.2, A23. The beam 14 here is pivoted up away from the mount block 16, exposing a groove 38 in which the brush holder slides.[6] Figures 13A-13C show a schematic side view of such operation, illustrating how the brush holder's "beam" 132 (colored blue) slides along the groove so as to securely engage with the mounting block:



*Id.* at fig.13, A37. The brush holder is moved between these positions with a handle that a user grips, and that is not shown in the figures above.

As noted, when the brush holder is engaged with the mounting block, a brush spring 24 biases the brush against the side of the spinning shaft. So as to ensure that this spring does not cause the

_____

[6] *See also* Cutsforth Engagement Animation, A473.

brush to fall out of the holder during installation or removal, the '906 patent also describes a brush catch that arrests any motion of the brush.

Figures 11 and 12 below depict the brush catch 110 (colored red) coupled to the beam 14 (colored blue):



'906 patent, fig.11, A35.          '906 patent, fig.12, A36.

'906 patent at 13:18-26; 38-40, A50. When the beam 14 is fully engaged with the mounting block 16 (colored green), as depicted on the left, the catch 110 is held away from the side of the brush 12 (colored gray) by a brush release tab 114 (colored orange). Because the brush catch 110 is not engaged with the brush, the brush 12 is free to move. A large spring (brush spring 24, not drawn) urges brush 12 against the spinning shaft, promoting a reliable electrical connection.

Removal of the brush holder is depicted on the right. As the beam 14 disengages from the mounting block 16, release tab 114 no longer presses against the brush catch 110. Spring pressure from the

11

brush catch spring 112 presses the catch 110 forward and against the side of the brush, engaging the brush and wedging catch 110 between brush 12 and the upper part of brush catch notch 56.  The wedged brush catch 110 prevents the brush from falling out of the brush box. Not even the force of the large spring (24, not drawn) pushing on the rear of brush 12 overcomes wedged brush catch 110.

Claim 14 recites a brush holder assembly that has such an arrangement of structures for sliding a brush holder into a mounting block and coupling/releasing it.  The claim requires that the "brush release" be a projection extending from the mounting block:

> 14. A brush holder assembly for holding a brush having a conductive element, the brush holder assembly comprising:
>
> a **mounting block** including an engagement portion;
>
> a **beam** having an engagement portion complementary with the mounting block engagement portion, wherein the mounting block engagement portion is slidably engaged with the beam engagement portion, and wherein the beam is slidable relative to the mounting block between a first, disengaged position and a second, engaged position;
>
> a **brush catch coupled to the beam** for selectively engaging the brush; and

> a **brush release** extending from the mount-
> ing block and configured for sliding en-
> gagement with the brush catch **said brush**
> **release is a projection extending frond**
> **[sic, from] the mounting block**.

'906 patent at 18:61-19:9, A52-53 (emphasis added).

Dependent claim 19 also features in this appeal. That claim adds

additional requirements for the "brush catch," namely, a spring:

> 19. The brush holder assembly of claim 14,
> wherein **the brush catch includes a**
> **spring.**

*Id.* at 19:23-24, A53 (emphasis added).

### C.    The Present IPR

Cutsforth's competitor MotivePower petitioned for IPR after

Cutsforth filed suit for patent infringement. Cutsforth urged that the

challenged '906 claims were valid, and supported its arguments with

evidence that, to a person ordinarily skilled in the field, the claims set

forth novel, nonobviousness concepts in brush holder design.[7] *See*

---

[7] Cutsforth tendered evidence that a person of ordinary skill in the art
at the '906 patent's filing date would have had a bachelor's degree in
mechanical engineering and at least several years of experience
working with dynamoelectric machines such as generators, and
specifically working with brush holder assemblies or other equipment
designed for use on electrified devices. Keim Decl. ¶ 22, A523-24.
MotivePower did not dispute this submission.

*generally* Decl. of Thomas Keim, Sc.D. ("Keim Decl."), A516-84 (setting

forth the detailed opinions of Thomas Keim, Sc.D., an MIT-trained,

highly experienced professional in the field); *see also* Keim CV, A338-

44.  The Board found anticipation by two references, "Ohmstedt" and

"Krulls"—each of which depicts a brush holder, but neither of which

reflects the other requirements of claim 14 or the other claims.  Dec. at

11-14; 16-18, A11-14, 16-18.  The Board's sole ground of institution

and of decision was anticipation; obviousness does not feature in this

IPR.

### 1.    The Krulls patent

Krulls (U.S. Patent 3,387,155, A157-66) shows multiple brushes

held side-by-side in a "magazine" that slides into an opening provided

in the generator housing, as pictured in its Figure 1:



Krulls at fig.1, A157.  Because Krulls' magazine design is markedly different than the single beam/single brush design of the '906 patent, Krulls does not have the claimed beam, nor does it have a brush catch coupled to anything like a beam—again, both requirements of the '906 claims.

### 2.    The Ohmstedt patent

The Ohmstedt (U.S. Patent 3,864,803, A138-42) brush holder resembles a set of "toast tongs."  It holds the carbon block between two flexible leaf springs as the block is put in place, which then spread apart and release the block, as shown in its figure 1 (A139):

15



But Ohmstedt does not have the claimed beam either, its inward-directed element 59 is not a "projection extending from" any structure as the Board improperly found, and it does not have a brush catch that includes a spring—all required by the '906 claims.

The Board's misapplication of the claims—eliminating the features identified here (and others) that distinguish the claims from the art—led the Board to hold claims 14, 16-19, 21, and 22 anticipated by Ohmstedt and by Krulls.  This appeal followed.

## SUMMARY OF THE ARGUMENT

Cutsforth's '906 patent describes and claims an important innovation in the field of removable brush holders.  With a specification covering 34 pages, and offering 17 diagrams, the patent

delineates a unique brush holder apparatus, the beam of which slidably engages to a mounting block bolted to a turbine, and uses a novel "brush catch" to keep the brush from falling out during servicing. The patent makes clear each of the key elements of the invention, how they all fit together, how to construct them, and how to use them. And in claiming the invention, the patent uses the same terms it uses in the specification.

Interpreting the '906 claims, the Board improperly refused to give weight to such extensive guidance. Despite Cutsforth's repeated citations to the drawings and written description, and despite an unrebutted evidentiary presentation on the established meanings of claim terms, the Board construed key terms as if they were in a vacuum, or as if the words had no definite meaning. For some terms, the Board applied an interpretation so broad as to seem as though the '906 patent's dozens of pages were never written. For others, the Board's treatment mixed the requirements of one claim element with another, resulting in effective scope far broader than either would permit.

The Board committed serious error. It abridged this Court's instruction that a claim term in IPR must be interpreted in light of the

patent, and only as broadly as is reasonable in that light. By effectively declining to consider context in interpreting claims, the Board arrived at an interpretation so overbroad as to sweep within its scope decades-old designs bearing little or no resemblance to the Cutsforth invention.

Cutsforth respectfully asks this Court to correct the Board's error and restore the '906 claims under review. Under a proper claim interpretation, neither of the references cited by the Board can anticipate the claims. Cutsforth therefore seeks reversal of the Board's decision, and judgment that '906 claims 14, 16-19, 21, and 22 are patentable over the cited art.

## STANDARD OF REVIEW

Anticipation rejections by the Board are questions of fact reviewed for substantial evidence. *In re Morsa*, 713 F.3d 104, 109 (Fed. Cir. 2013). In the absence of disputed fact issues, this Court reviews the claim construction determinations of the Board de novo. *In re Donaldson Co.*, 16 F.3d 1189, 1192 (Fed. Cir. 1994) (en banc); *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 840-41 (2015). Where the Board's claim construction determination involves resolution of disputed fact issues, this Court examines the Board's

subsidiary fact finding for substantial evidence. *Dickinson v. Zurko*, 527 U.S. 150, 152 et seq. (1999); *Teva Pharms.*, 135 S. Ct. at 840-41 (requiring deferential review of district court fact-finding in support of claim construction determinations); *In re Gartside*, 203 F.3d 1305, 1315 (Fed. Cir. 2000) (finding "substantial evidence" the appropriate standard).

## **ARGUMENT**

The Board committed serious legal errors.  In all claims under review, it misapplied the broadest reasonable interpretation standard so as to find a "projection" in a structure that in no way "projects."  It distorted application of claim 19's requirement that the "brush catch includes a spring."  It extended the term "beam" beyond any reasonable limits.  And it emptied the claim term "coupled to" of any discernable meaning.  The Board's claim interpretation analysis was brief, light on detail, and rejected at every turn the notion that ordinary meaning and the patent specification should direct the scope given to key claim terms.  It, and the Board's decision as a whole, should be reversed.

**I.    THE BOARD MISAPPLIED THE BROADEST REASONABLE INTERPRETATION STANDARD, CONSTRUING CLAIMS FAR BEYOND ANY REASONABLE MEANING**

In IPR, claims receive their broadest reasonable interpretation ("BRI").  *In re Cuozzo Speed Techs., LLC*, 778 F.3d 1271, 1280-82 (Fed. Cir. 2015); *see also* 37 C.F.R. § 42.100(b).  Under that standard, "claims are to be given their broadest reasonable interpretation consistent with the specification, and claim language should be read in light of the specification as it would be interpreted by one of ordinary skill in the art."  *In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004) (quote marks and ellipses omitted).

As this Court has repeatedly reminded the Board, the "broadest reasonable interpretation" standard does not validate claim interpretations that unreasonably depart from the specification.  *In re Abbott Diabetes Care Inc.* is highly instructive.  696 F.3d 1142 (Fed. Cir. 2012).  That case vacated a Board determination of obviousness because the Board's interpretation of "electrochemical sensor" went far beyond the specification.  In that case, the figures and description universally depicted the claimed "electrochemical sensors" as untethered by cables or wires.  The sole reference to a sensor having such cables was in a section disparaging the failures associated with

them in the prior art.  The Board's interpretation, which permitted the presence of cables or wires, was thus unreasonable, and was overruled.  696 F.3d at 1148-49.

Other cases similarly reflect the limits surrounding the "broadest reasonable interpretation" standard.  *In re NTP, Inc.*, 654 F.3d 1279, 1288 (Fed. Cir. 2011) ("While the Board must give the terms their broadest reasonable construction, the construction cannot be divorced from the specification and the record evidence."); *In re Buszard*, 504 F.3d 1364, 1366-67 (Fed. Cir. 2007) (reversing Board decision because construction contradicted the meaning assigned by "persons experienced in the field").

### A.    The Board Improperly Read "projection extending from" to Cover a Structure Recessed Into Another Structure

The Board's entire treatment of this term was to write, "'Projection extending from the mounting block' is not limited to projections extending **outwardly from** the mounting block."  Dec. at 9 (emphasis added), A9.

The Board nowhere explicitly addressed the parties' key dispute for the term: whether the projection must "jut out" from its

surroundings. But the Decision makes clear that the Board implicitly rejected any such limitation.

The Board held that ramps 59 in the Ohmstedt patent practiced the "projection extending from the mounting block" limitation. *Id.* In the drawing below, said ramps 59 (colored orange) are depicted as milled into the purported "mounting block."[8] Nowhere does ramp 59 extend out above the surface of the "mounting block," or in any other way "project" from the block's face. To the contrary, it sinks below the surface, forming a ramp that angles down into the brush box's interior:



Ohmstedt fig.1, A139.

No reasonable interpretation of "projection extending from the mounting block" could cover Ohmstedt's ramps 59. The reasons are

---

[8] Cutsforth does not concede that this structure is a "mounting block," but uses that term for clarity in illustrating the Board's analysis.

evident from the claim language, the specification, and from the

unrebutted technical testimony of a person skilled in the art.

To begin with, the Board's construction is inconsistent with the

plain text of the claim which twice emphasizes the importance of

"projecting" and "extending."  The relevant limitation requires:

> a brush release **extending from the mounting block** and configured for sliding engagement with the brush catch said brush release is ***a projection extending frond [sic, from] the mounting block***.

'906 patent at 19:5-9, A53 (emphasis added).  The claim language the

Board construed (shown in bold and italics) requires a "projection

extending frond [sic, from] the mounting block."  That language

fundamentally differs from Ohmstedt's sunken ramps which do not

"extend from" the brush box 13 (colored green, the purported

"mounting block").

Lest there be any doubt as to the importance of projecting and

extending, the claim recites additional language (shown in bold) that

re-emphasizes "extending from the mounting block."  In view of the

repeated emphasis in the claim language on projecting and extending,

no reasonable interpretation could cover Ohmstedt's sunken ramp 59.

The Board's implicit interpretation also lacks support from the '906 specification. In the patent, three figures disclose "projections" or "projecting"; none even distantly resembles the descending ramp of Ohmstedt. First, figure 8 of the '906 patent depicts a "catch pin" 92 (colored orange). According to the specification, this pin is "in a spring-loaded position, **projecting out from the underside**" of the surrounding structure. '906 patent, 11:61-63 (emphasis added), A49.



*Id.* at fig.8, A32. The specification's use of the word "projecting out" to describe catch pin 92 demonstrates how the word "projection" implies a jutting outward.

Figures 11 and 12, already discussed *supra*, also depict a "projection" in the form of the brush release tab 114 (colored orange). Again, this tab plainly juts out from the surrounding material of the mounting block 16 (colored green).



*Id.* at figs.11-12, A36-37.

In every example from the '906 patent, every "projection" (catch pin 92 and tab 114) plainly juts out from its surroundings. The '906 patent includes no contrary usage. The scope accorded by the Board to the phrase "projection extending from" thus has no support anywhere in the specification.

The Board's proposal also cannot be reconciled with the plain English meaning of "projection," which requires a jutting out:

> **pro•jec•tion** \ prə'jekshən, prō'-\ *n* . . . **6 a** (1) **:** a jutting out or causing to jut out (2) **:** a part that projects or juts out **:** an extension beyond something else <∼ of earth above its natural level — Thomas Hardy> <∼s . . . in the corners reveal the heavy timber framework—*Amer. Guide Series: Mich.*>

WEBSTER'S 3RD NEW INT'L DICTIONARY 1813 (1993) (defining "projection" (emphasis added)), A467-72.  The Board did not discuss this dictionary.

Cutsforth also presented expert testimony that a person of skill would have deemed "jutting out" to be a necessary aspect of the claim term "projection extending from."  Keim Decl. ¶ 110, A572-73.  In re-defining "projection" in such a broad way, the Board contravened, without even discussing, such evidence.

As noted *supra*, constructions that go so far beyond the teachings of the specification are not "reasonable" within the "broadest reasonable interpretation" standard.  *E.g.*, *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1148-49 (Fed. Cir. 2012); *In re Buszard,* 504 F.3d 1364, 1366-67 (Fed. Cir. 2007).  Cutsforth respectfully asks that this Court set aside the Board's interpretation of "projection extending from" and hold that the broadest reasonable construction of that term requires that the projection project, or jut, out from its surroundings.

Correcting for the Board's errors in ascertaining the broadest reasonable interpretation of "projection extending from the mounting block," the record demonstrates that Ohmstedt does not practice this limitation.  *See infra* at 57 (sec. II.B.1).

**B.    The Board's Interpretation of Claim 19's "brush catch includes a spring" Requirement was Facially Unreasonable**

Claim 19 is unambiguous that a spring must be part of the brush catch: "The brush holder assembly of claim 14, wherein **the brush catch includes a spring**." '906 patent at 19:23-24, A53 (emphasis added). The claim expressly does not cover any device lacking a spring in the brush catch, even if it has a spring somewhere else.[9]

The Board reasoned that a brush holder 11 in the Ohmstedt patent was the claimed "beam." Dec. at 12, A12. For claim 19, it concluded that certain teeth (element 25) were the "brush catch." *Id.* But from there it circled back on its own reasoning, concluding that a portion of the beam (legs 21, part of the previously-identified brush holder 11) were the claimed "spring."

In effect, the Board improperly rewrote the requirements of claim 19, assigning the requirement "includes a spring" to the "beam"

---

[9] The Board's Decision did not discuss this as a claim interpretation issue. It simply held, after an abbreviated discussion of the references, that Ohmstedt taught the requirements of claim 19. Dec. at 13, A13. But the Board's own reasoning demonstrates its error.

rather than the "brush catch."  The following diagram depicts the flaw in the Board's treatment:

**Claim 19's Requirements**



**Board's Incorrect Construction of Claim 19**



The Board's logic, if affirmed, would implicitly redefine claim 19's requirement that "the brush catch includes a spring" to mean "the brush catch does not include, but is coupled to, a spring."  Such an approach would be wrong.

The '906 patent is clear about the relationship of the "brush catch" and "spring."  Figures 11 and 12 are, again, instructive.  They

show how brush catch 110 includes a spring 112—that is, the spring is a part of the brush catch.



'906 patent, fig.11, A35.          '906 patent, fig.12, A36.

*See also* '906 patent at 11:27-57 (describing same), A49.

Cutsforth respectfully requests that this Court set aside the Board's erroneous implicit interpretation of claim 19, and apply that term according to its plain, ordinary, reasonable meaning.

Correcting for the Board's errors in ascertaining the broadest reasonable interpretation of "the brush catch includes a spring," the record demonstrates that Ohmstedt does not practice the limitation. *See infra* at 58 (sec. II.B.2).

## C.    The Board Misconstrued "beam" to Cover Structures That Are Not Rigid and Not Relatively Long and Thin— Both Part of the Ordinary Meaning of the Term

The Board's interpretation of "beam" goes beyond any reasonable construction of that term.  Specifically, the Board's

interpretation improperly covers structures that are elastic or resilient rather than rigid, or that lack the long, straight shape that the word "beam" properly denotes.

The Board held that the broadest reasonable interpretation of "beam" was "elongated support structure."  Dec. at 8, A8.  That definition, combined with the Board's express rejection of Cutsforth's proposed boundaries, extends "beam" to address nearly any structural apparatus that an engineer might devise, no matter how great the deviation from the '906 patent's teachings.  For example, the Board's construction implicitly covers each of the following structures that are both elongated and structural, but none of which would be termed a beam in ordinary use—particularly not by an ordinary mechanical engineer:[10]

---

[10] As noted *supra*, there is no dispute that the level of ordinary skill for the '906 patent includes a bachelor's degree in mechanical engineering and at least several years of relevant experience.  *See* Keim Decl. ¶ 22, A523-24.



"Beams" Under the Board's Construction



The Board's unreasonably broad interpretation led it to wrongly apply the label "beam" to the complex brush magazine 12 in Krulls (which is neither long nor straight), and the U-shaped tongs in Ohmstedt's brush holder 11 (which are not long, straight, or rigid).

The Board's conclusion far exceeds the boundaries provided for in the law of claim interpretation for IPR, and comprises clear error of law. *In re Morris*, 127 F.3d 1048, 1054 (Fed. Cir. 1997) ("[A]s an initial matter, the PTO applies the verbiage of the proposed claims the broadest reasonable meaning of the words in their ordinary usage as they would be understood by one of ordinary skill in the art."). This Court should reject the Board's over-expansive approach and describe the broadest reasonable interpretation of "beam" in accordance with

the '906 patent's teachings to be "a long, straight structural member designed to be rigid."

### 1.    The '906 specification universally supports reasonable limits on the term "beam"

Each and every use of "beam" in the '906 patent—in the claims, written description, and figures—indicates that any reasonable definition of "beam" requires "a long, straight structural member designed to be rigid." Figures 4A and 4B are just two of many supportive figures:



'906 patent at figs. 4A-4B, A25-26. Both of these diagrams illustrate that beam 14 (colored blue) is long and straight with respect to its depth. In this configuration, beam 14 has a C-shaped cross section (i.e., a "C-beam"). The specification describes it as made of high tensile strength steel or other appropriate materials, thus confirming its rigidity. *Id.* at 5:3-17, A46.

Other matter in the specification demonstrates further how beam 14 plays a key structural role in the '906 patent's invention.

Figure 2, for example, shows the "beam" as the support for other key elements such as the "brush" and "brush catch." As can be seen, beam 14 (colored blue) provides crucial structural support for the brush 12 (colored gray), brush box 10, and coil spring 24. To provide that support, the beam is, again, long and straight, with a C-shaped cross-section designed for rigidity:



'906 patent at fig.2, A23.

Figures 13 and 17 are similar. They depict the "beam" (elements 132 and 206, colored blue) as both long and straight, again consistent with Cutsforth's proposal:



'906 patent at fig.13, A37; fig.17, A43.

While the '906 figures amply show the shape of the required "beam," the description establishes its strength and rigidity:

> [T]he **beam 14** and lower mount block 16[ ] **must withstand the greatest forces in the design**, [and] are made of **more durable metals such as high tensile strength steel**.

*Id.* at 5:11-17 (emphasis added), A46. The patent also confirms its preferred material for the beam as being stainless steel, a rigid material when formed into the long, straight member shown in the patent:

> [B]eam 14 [and other components] . . . may be constructed of a metal such as stainless steel, for example **heat treated stainless steel, to**

> **provide high strength, durability, and corro-
> sion resistance.**

*Id.* at 5:5-11 (emphasis added), A46.  Such statements again emphasize the importance of strength and rigidity for the "beam."

The Board overlooked such disclosures.  In rejecting Cutsforth's reliance on them, the Board referenced a line in the written description mentioning use of "other metals, non-metals, **plastics** and/or composites" for the various components of the design.  Dec. at 7-8 (emphasis Board's) (citing '906 patent at 5:9-11, A46), A7-8.  The Board reasoned, *sans* evidence, that the presence of the word "plastics" meant that the beam need not be rigid.

The Board misread the description and its conclusion cannot be squared with the evidence, for three reasons.  First, as noted above, the description specifically calls out how the beam must "withstand the greatest forces in the design" and so is made of "more durable materials." '906 patent at 5:11-17, A46.  Second, the matter quoted by the Board refers to the materials for any of the various components of the design; it does not single out the "beam."  Third, the Board seems to have assumed, without any evidence at all, that "plastics" are never "rigid."  Though the Board raised this issue *sua sponte*, and neither party submitted evidence on it, nominal inquiry would have revealed

35

common "rigid" plastics, including "rigid PVC" (polyvinyl chloride) and high-density polyethylene ("HDPE").  In assuming, without confirming, that plastics are never rigid, the Board improperly deviated from both the patent and the apparent knowledge in the field.  *Cf. In re Buszard*, 504 F.3d 1364, 1367 (Fed. Cir. 2007) (reversing Board analysis that unreasonably held, "contrary to science," that "rigid" and "flexible" could be equated).

### 2. Unrebutted evidence demonstrated that, in the field, "beams" are known to be both straight and rigid

Cutsforth provided unrebutted documentary and expert evidence regarding the ordinary meaning of "beam," yet the Board made no effort to weigh or analyze it, or to make any fact determinations on the issue.  Dec. at 7-8, A7-8.  That was legal error.

Cutsforth presented the expert declaration of Dr. Keim, an MIT-trained mechanical engineer with decades of experience.  *See* Keim Decl. ¶¶ 83-89, A558-62.  As previously noted, there is no dispute that the claims are to be interpreted from the perspective of a mechanical engineer; Dr. Keim's unrebutted testimony sets forth precisely that perspective.

Dr. Keim explained why no mechanical engineer would embrace an overexpansive interpretation of "beam" such as the Board's, but would understand the term to require a structure that was rigid, long, and straight. *Id*. Dr. Keim also presented a technical dictionary that defined "beam" consistent with the meaning Cutsforth assigns: "a structural member the length of which is long compared with its cross-sectional dimensions . . . [and that is] used to carry transverse and lending loads." *Id*. ¶ 86, A559-60 (quoting OXFORD DICTIONARY OF MECHANICAL ENGINEERING 24 (2013), A512-15).

Dr. Keim also presented excerpts from a leading mechanical engineering textbook, Roark and Young's *Formulas for Stress and Strain*. Keim Dec. ¶ 87-88, A560-61 (discussing RAYMOND ROARK & WARREN YOUNG, FORMULAS FOR STRESS AND STRAIN 89, 116, 195-95 (1975), A428-40). These further confirmed that, in the mechanical engineering field, a "beam" is long, straight, and rigid. *E.g.*, ROARK & YOUNG 89 ("The beam is straight or nearly so. . . . The beam is long in proportion to its depth."), A431. Indeed, Roark and Young depicted a "beam" whose structure is highly similar to that of the '906 patent, further suggesting that the '906 patent uses the "beam" definition generally applied in mechanical engineering:



'906 patent at fig.4A, A25; ROARK & YOUNG 195, A436; *see also* Keim

Decl. ¶ 89, A561-62 (discussing JAMES GERE & STEPHEN TIMOSHENKO,

MECHANICS OF MATERIALS 49 (2d ed. 1984) ("[I]n the case of a bar in

tension (Fig. 2-2) or any other structural element, **such as a beam**, it is

customary to speak of **stiffnesses** and flexibilities rather than spring

constants and compliances." (emphasis added)), A454).

The Board simply ignored all such evidence, preferring to

interpret the term "beam" from its own viewpoint rather than that of a

mechanical engineer.  Such is flatly improper.  *Phillips v. AWH Corp.*,

415 F.3d 1303, 1313 (Fed. Cir. 2006) (en banc); *Leo Pharm. Prods., Ltd.

v. Rea*, 726 F.3d 1346, 1352 (Fed. Cir. 2013) (vacating Board

construction that could not be reconciled with meaning to one of

ordinary skill in the art); *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d

1295, 1299 (Fed. Cir. 1999) ("[W]ords of ordinary usage must

nonetheless be construed in the context of the patent documents.  Thus

the court must determine how a **person of experience in the field of**

**this invention** would, upon reading the patent documents, understand the words used to define the invention." (emphasis added)).

The unrebutted evidence demonstrates that in the field of mechanical engineering, a "beam" is a well-known structure understood to have both a particular shape (long and straight) and a particular mechanical characteristic (rigid). Ignoring this evidence was error as a matter of law, and the undisputed record demonstrates that, within the field of mechanical engineering, and as used in the '906 patent, the broadest reasonable interpretation of "beam" is "a long, straight structural member designed to be rigid."

Correcting for the Board's errors in ascertaining the broadest reasonable interpretation of "beam," the record demonstrates that neither Krulls nor Ohmstedt practice the limitation. *See infra* at 50 (sec. II.A.1, showing why Krulls discloses no "beam"), 61 (sec. II.B.3, same, for Ohmstedt).

### D.    The Board Misconstrued "brush catch coupled to the beam"

Claim 14 recites a brush holder that has a "beam" and a "brush catch" that is "coupled to the beam." '906 patent at 18:61-19:9, A52-53. The Board's error concerns whether the "coupling" requirement requires two distinct structures (Cutsforth's view) or one structure, a

part of which may be denoted as a "sub-component" of the larger structure (the Board's view). As explained below, the claim language, written description, and unrebutted extrinsic evidence uniformly support the conclusion that a "coupled" relationship requires two distinct structures.

### 1. The claims require a particular "coupled" relationship

The claims recite a specific configuration of elements for the claimed brush holder:

> 14. A brush holder assembly . . . comprising:
> . . .
> a **beam** having an engagement portion . . .
> a **brush catch coupled to the beam** for selectively engaging the brush . . . .

*Id.* 18:61-19:5, A52-53 (emphasis added). This text imposes straightforward logical requirements: there must be a beam, there must be a brush catch, and the two must be "coupled to" one another. The Board's decision cannot be reconciled with either of these clear requirements set forth in the claim themselves.

Claims that recite separate elements (i.e., "beam," "brush catch"), relating to one another in a specific way (i.e., coupled), must be construed in such a way as to maintain those relationships. *E.g.*, *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1305 (Fed. Cir. 2014) (rejecting

proposed construction that "reads [a term] out of the claim"); *Becton, Dickinson & Co. v. Tyco Healthcare Grp.,* 616 F.3d 1249, 1254 (Fed. Cir. 2010) (finding error in district court construction that "did not require a spring means that was a distinct structural component" from another claimed element); *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

Here, such considerations precisely govern the phrase "a brush catch coupled to the beam."  '906 patent at 19:4-5, A53.  The "beam" and "brush catch" must be "coupled" to one another; ergo, they must be distinct physical structures.  Unless these two elements are physically distinct, the claim's requirement of "coupling" has no meaning.  *See In re Cuozzo Speed Techs., LLC*, 778 F.3d 1271, 1283 (Fed. Cir. 2015) ("[I]t would be illogical to regard one unit as being 'attached' to itself." (quote marks and citation omitted)).

The phrase "coupled to" describes a relationship between distinct structures.  It is not synonymous with "is part of" or "includes," or other phrases that might address how a single structure has discernible parts.  To illustrate: the barb on a fishhook might be "part of" the fishhook, or the fishhook might "include" a barb, but the barb is

41

not "coupled to" the fishhook—it is an integral part of the fishhook's overall shape:



The barb is the region where the metal of the fishhook has been machined into a sharp projection so as to hook a fish more securely. The barb and the hook are in no sense "coupled" to one another. To the contrary, they are integral.

By failing to require that the "beam" and "brush catch" be distinct physical structures, the Board improperly expanded the claim to cover structures lacking a distinct brush catch, so long as some part of the "beam" could act as a catch, in the same way that part of the fishhook acts as a barb. Such an approach contravenes the claim's plain text.

## 2.    The written description uniformly distinguishes the "beam" and "brush catch"

In addition to the clear requirements of the claims, the written description supports Cutsforth. Every figure matches the claim text in that it depicts the "beam" and "brush catch" as distinct structures, coupled together. Figure 11 is illustrative:



'906 patent fig.11, A35. Beam 14 (colored blue) is in the center. Atop beam 14 is brush catch 110 (colored red). Brush catch 110 sits in brush catch notch 56.

There is no doubt from figure 11 that beam 14 and brush catch 110 are distinct physical structures, though they are (consistent with the claims under review) "coupled" to one another. Similar examples of "coupled" structures exist throughout the '906 patent. *See, e.g.*, '906 patent at 7:45-46 ("FIG. 4A shows a brush spring 24 **coupled to** a beam 14."), A47 (emphasis added); 10:6-8 (describing figure 5 –

43

"Shown are several conductive elements as **coupled** together when an example mounting bracket is in an engaged position relative to a mount block."), A48 (emphasis added).  And there is not a **single** example, anywhere, of an embodiment in which the "beam" and "brush catch" are anything other than distinct physical structures.

Before the Board, MotivePower offered just one suggestion of how the evidence might support extending the claim to cover structures lacking a distinct "beam" and "brush catch."  It suggested that figure 11's depiction of "brush catch notch 56" somehow meant that the "beam" and "brush catch" were indistinct.  MPI Reply at 3, A609.  The Board did not embrace this argument, and review of the patent reveals why this Court should reject it.  "Brush catch notch 56" is merely an indentation in the beam 14 to accommodate brush catch 110.  '906 patent at 13:27-30, A50.  If anything, the presence of brush catch notch 56 further demonstrates the engineering considerations in "coupling" distinct physical articles to one another.

Other figures equally depict the "beam" and "brush catch" as distinct structures.  One embodiment contemplated that the "brush catch" might be the conductor that electrically connects the brush to a voltage source:



*Fig.1*

'906 patent fig.1, A22.  Here, the "brush catch" is element 26, which is also the "brush conductor."  *Id.* at 13:60-54, A50.  Again, there is no doubt that the "brush catch" is physically distinct from, though coupled to, the "beam" (again, element 14).

A third variation on the "brush catch" concept in the '906 patent further confirms that it is physically distinct from any "beam":



'906 patent fig.3, A24.  The patent envisions a "loop" to hold the brush in place, as follows:

> In another example, referring now to Fig. 3, a loop attached to the brush top 55 may pass through the spring coil 54 (the loop may be tied or clipped into place), with the spring coil 54 pushing on the brush 12 until the spring coil 54 reaches the spring hook 50, **the loop then holding the brush 12 in place and preventing further movement forward**.

*Id.* at 13:64-14:3 (emphasis added), A50.  Though this portion of the specification does not use the phrase "brush catch," its meaning is clear.  Equally clear is that it contemplates a "brush catch" plainly separate from any "beam."

Neither MotivePower nor the Board identified any portion of the specification in which the "beam" and "brush catch" are conflated, and Cutsforth is aware of none.  Cutsforth thus reiterates its view that the "brush catch" and "beam" must be physically distinct, and "coupled to" one another.

> **3.    Unrebutted extrinsic evidence confirmed that one of skill would understand "brush catch coupled to the beam" to require different physical structures**

Only Cutsforth presented extrinsic evidence of how the claimed "brush catch" and "beam" relate to one another.  Dr. Keim's declaration set forth in detail how Cutsforth's proposed definition comported with the claim's interpretation by a skilled artisan.  *See* Keim Decl. ¶¶ 90-91, A562 (confirming that a person of skill would understand the "beam"

and "brush catch" to be separate elements). MotivePower did not present declarations or affidavits on this point. Yet the Board failed to credit or even discuss Dr. Keim's statements in reaching its defective interpretation of claim 14. Because nothing suggests that the Board considered extrinsic evidence at all concerning this term, this Court owes the Board no deference in this, or any other aspect of claim construction.

### 4. Nothing in the claims or specification supports extending the claims over "sub-components"

The Board's theory was that one might practice the claims with a device in which the "brush catch" was a "sub-component" of the "beam." *See* Dec. at 8, A8. The Board reasoned that, because the patent had no express disclaimer *against* covering such a structure, the claim should cover it. *Id.* That was improper.

First, the Board's conjecture that the "brush catch" might be a "sub-component" of the beam cannot be reconciled with the claim's text. If the "brush catch" is a part of the beam—in the same way that a fishhook's barb is part of the fishhook—then the requirement that the two be "coupled" to one another has been lost. The only way for the "coupling" relationship to be maintained is if the "beam" and "brush catch" are distinct physical structures.

47

Second, as noted, reasonable boundaries on a claim's scope can arise in the absence of literal written disclaimer.  The claim's language and usage in the specification are critical indicators of scope, as well. *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1150 (Fed. Cir. 2012) (rejecting contention that "explicit disclaimer" was necessary, where claim language and usage in specification demonstrated appropriate limits on the claim).  Similarly, this Court has not held that application of the broadest reasonable interpretation standard creates license to ignore the teachings of the specification.  *In re NTP, Inc.*, 654 F.3d 1279, 1288 (Fed. Cir. 2011) ("While the Board must give the terms their broadest reasonable construction, the construction cannot be divorced from the specification and the record evidence.").

As discussed herein, the specification and record evidence uniformly support the simplest meaning of the claim: it requires distinct physical structures for the "beam" and "brush catch."  *Becton, Dickinson*, 616 F.3d at 1254 ("Where a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention . . . ." (citations omitted)).  Cutsforth respectfully submits that the Court should thus construe the phrase "brush catch coupled to the beam" to mean "a

48

brush catch (which is a physically distinct structure from the beam) coupled to the beam."

Correcting for the Board's errors in ascertaining the broadest reasonable interpretation of "brush catch coupled to the beam," the record demonstrates that Krulls does not practice the limitation.  *See infra* at 53 (sec. II.A.2).

## II.    THE PTAB'S ANTICIPATION DETERMINATION CANNOT STAND WITH THE CLAIMS PROPERLY INTERPRETED

Krulls and Ohmstedt certainly relate to brush holders, but they just as certainly do not anticipate the rejected claims.

### A.    The Claims are Novel over Krulls

Krulls teaches a markedly-different approach from the single-beam/single-brush holder design of the '906 patent.  Krulls' approach can be seen by examining its "removable brush magazine 12":



Krulls fig.1, A157.  As the diagram shows, magazine 12 holds several
brushes (i.e., element 40) simultaneously.  It also has a number of
other elements attached to it.  The Board determined that it was this
magazine 12 that was purportedly the claimed "beam."  Dec. at 17, A17.

### 1.    Krulls does not teach the "beam" required by all claims

Magazine 12 of the Krulls device is a complex assembly.  The
patent identifies the major components as:

- handle 80 (which includes projections 84);
- rectangular abutments 24 (which include extensions 82);
- front wall 36;
- side wall 38;
- rear wall 34 (obscured in the illustration);
- insulating cover 99;
- resilient members 56 (which includes outer legs 66, and
  center leg 66 (obscured)); and
- leaf springs 46 (with coiled ends 48, and straight portions
  50 (obscured)).

*See* Krulls at 3:22-46 (describing such features), A162.

Under any proposed construction of the '906 claim term "beam"—i.e., Cutsforth's proposal, "a long straight structural member designed to be rigid" or the Board's "elongated support structure"—magazine 12 (with or without its various components) cannot be a "beam." Magazine 12 is itself neither long nor straight. In general, it is a sort of compact complex cuboid, shorter in its depth than in its length or its width, and with various extensions, concavities, and protrusions not accounted for in the '906 patent's reference to a "beam." Taken in its entirety, magazine 12 is not "long," it is not "straight," and it does not provide beam-like support. It cannot be the claimed "beam."

Nor are any of the various components of magazine 12 "beams." Handle 80 extends in a C-shape (along its length, not cross-sectionally), with projections 84 on its sides. It is not "long" or "straight," and as such it is not a "beam." And even if it were long and straight, handle 80 does not meet the '906 claims' requirement that part of the "beam" must "slidably engage[]" with a separate structure, the "mounting block." Nothing in the Krulls patent indicates that handle 80 ever "slidably engage[s]" with any such thing.

51

Nor is "resilient member 56" a "beam"; it is neither "straight" nor "rigid." The shape of resilient member 56 can be seen by examining figure 1 of Krulls:



Krulls fig.1, A157; Keim Decl. ¶ 126, A581. As the figures show, resilient member 56 is bent into a three-prong shape, and is not "straight." Further, resilient member 56 is not "designed to be rigid." Quite the opposite, it is designed to be "resilient"—i.e., springy—and to bend and flex as the magazine 12 is either put into or removed from its cradle. *See* Krulls at 2:37-44; 3:2-8 (describing the flex in resilient member 56 as part of releasing the brush into the device), A161-62. As it is neither "straight" nor "designed to be rigid," resilient member 56 is not a "beam."

52

As Krulls lacks the claimed "beam," it cannot anticipate any claim under review.  Cutsforth respectfully submits that this Court should reverse the Board's contrary finding.

### 2.    Krulls does not teach the "brush catch coupled to the beam" required by all claims

The Board reasoned that resilient member 56 of the Krulls device disclosed a "brush catch" as that term was used in the '906 claims.  The '906 claims require more, though.  They require that the "brush catch" be "coupled to the beam."  Resilient member 56, even if some portion of it were to operate as a "brush catch," does not teach this relationship.

### a)    The various regions of Krulls' resilient member 56 do not disclose a "brush catch coupled to [a] beam"

In the Krulls device, resilient member 56 is a single piece of metal, cut and bent to form a specific shape:



Krulls fig.1, A157; Keim Decl. ¶ 126, A581.  To whatever extent it may
be contended that resilient member 56 discloses a "brush catch" in one
region and (as discussed *supra*) a "beam" in some other region,
resilient member 56's single-piece construction means that the two
regions are not in any sort of "coupled" relationship.  As shown above,
the '906 claims require that the "beam" and "brush catch" be separate
structures from one another.  Two regions of one metal piece, however
cut and bent, do not satisfy that requirement.  *See supra* (discussing
how a fishhook's barb is not "coupled to" the fishhook).

### b)    Krulls' resilient member 56 is not itself "coupled to" a claimed "beam"

Finally, nothing resilient member 56 is attached to could be
considered a "beam" within the meaning of the '906 claims.  The Board
concluded, on MotivePower's proposal, that the claimed "beam" is

magazine assembly 12. As an initial matter, resilient member 56 is a part of assembly 12. Reasoning that the resilient member 56 is "coupled to" assembly 12 amounts to reasoning that the member couples to itself—a proposition that reduces "coupled to" to meaninglessness.

Even if such argument were permissible, relying on resilient member 56 as the "brush catch" frustrates other requirements of claim 14. Specifically, the claim requires that the "beam" must "slidably engage" with a mounting block. '906 patent, at 18:66-67, A52. In Krulls, the only part of magazine assembly 12 that might "slidably engage" with the purported mounting features is resilient member 56 itself. As already discussed, the '906 claims require that the "beam" and "brush catch" be distinct physical structures; it is inappropriate for resilient member 56 to serve as both the "beam" and "brush catch" in such circumstances. *See Becton, Dickinson & Co. v. Tyco Healthcare Grp.,* 616 F.3d 1249, 1254 (Fed. Cir. 2010) (finding error in failure to require distinct physical structures for separate claim elements).

For at least these reasons, the Krulls patent does not anticipate any of the '906 claims presently under review. Cutsforth respectfully

submits that this Court should reverse the Board's judgment that the '906 claims are unpatentable as anticipated by the Krulls patent.

### B.    The Claims are Novel over Ohmstedt

Ohmstedt teaches a markedly-different approach from the Krulls patent and from the '906 claims. The Ohmstedt device uses a tongs-type holder to place a brush into a previously-secured box:



Ohmstedt fig.1, A139. The "tongs" (in Ohmstedt, "legs 21" of "brush holder 11") spread apart as the brush descends into place, dropping the brush into position.

### 1. Ohmstedt does not teach a "brush release [that] is a projection extending from the mounting block" required by all claims under review

To the extent that the Ohmstedt device has a "brush release," it is not a brush release that "is a projection extending from the mounting block." The Ohmstedt device's putative "brush release" is undisputedly sunk into the metal of the brush box. It is not a "projection" and is not "extending from the mounting block," or indeed, "extending" in any sense at all.

The Board, erroneously, reached a different conclusion. It reasoned that the tong-spreading action of the Ohmstedt device—whereby resilient legs 21 are spread apart, thus dropping the brush into position in the brush box—must necessarily include some sort of "brush release." Dec. at 12-13, A12-13. And for that brush release, the Board pointed to the ramps 59 milled into the edges of the brush box, at the end of slots 57. *Id*.

Even if these ramps were in some sense a "brush release," they do not reflect the '906 claims' requirement of a brush release that "is a projection extending from the mounting block." The ramps are carved, milled, or otherwise sunk into the material of the brush box. They are not "projections," and they do not "extend." As discussed *supra*, the

'906 patent makes clear that the "projection[s]" must jut outward from the surrounding material. The ramps milled into the Ohmstedt device do not satisfy this requirement. As such, this Court should conclude that the Ohmstedt device does not practice the '906 claims' requirement that the "brush release is a projection extending from the mounting block."

### 2. Ohmstedt does not teach that the "brush catch includes a spring," as required by '906 claim 19

Even if the Ohmstedt patent taught the technology of Cutsforth's broadest claims—and, as discussed *infra*, it does not—the additional requirements of claim 19 decidedly remain patentable.

As discussed *supra*, the '906 claims address the "brush catch" as a separate structure from the "beam," such that the two are "coupled" to one another. The "spring" is a third structure that claim 19 requires the brush catch include. The diagram below shows the proper construction of claim 19:

**Claim 19's Requirements**



The Ohmstedt device cannot be reconciled with the requirements of a properly interpreted claim 19. Ohmstedt has metal teeth 25 biased against the brush. Ohmstedt at 2:15-17, A141. Those teeth (Ohmstedt's alleged "brush catch") include no spring. The biasing pressure comes not from teeth 25, but from the spring action of legs 21 (a part of the alleged "beam," operating as a sort of leaf spring).



Ohmstedt figs.1, 2, A139-40. As the pictures show, legs 21 of the Ohmstedt device are inwardly biased "for tightly gripping an electrically conductive brush 17." *Id.* at 2:12-17, A141. This gripping is

through teeth 25, which are pressed into the sides of the brush by the inward pressure of the legs.

The Board correctly identified legs 21 as exerting a "spring" force.  Dec. at 13, A13.  But it improperly concluded that the spring force of legs 21 satisfied the requirements of claim 19.  *Id*.  A spring in the "beam" (the Board found legs 21 were part of the claimed "beam") is not what claim 19 requires.[11]  *See id*. (explaining the Board's reasoning).  The claim requires a spring in the **brush catch**, which under the Board's analysis would be teeth 25 of the Ohmstedt device.

Teeth 25 of the Ohmstedt device include no spring.  They are biased inward by the spring action of a separate component, the beam.  Such is a qualitatively different approach than the one taken in claim 19 of the '906 patent.  As previously discussed, the Board's approach to this claim cannot be reconciled with its facial requirements:

Nothing in the Ohmstedt device teaches claim 19's requirement that the "brush catch includes a spring."  As such, whatever the Court's

---

[11] Another problem with the Board's approach is that it makes no sense to identify the same structure (resilient legs 21) as being both a beam and a spring.  A mechanical engineer would certainly understand a beam (which functions as a rigid structure) to be fundamentally different than a resilient structure (like a spring).  Keim. Decl. ¶ 89, A561-62.

view as to the patentability of independent claim 14, Cutsforth

respectfully submits that the Court should find claim 19 not

anticipated by the Ohmstedt patent.

### 3.    Ohmstedt does not teach the "beam" required by all claims

Nothing in the Ohmstedt device satisfies the '906 claims'

requirement of a "beam." Though the Board and MotivePower

identified brush holder 11 as a candidate for this requirement, that

structure is well outside the scope of the '906 claims.

Brush holder 11 is a U-shaped structure that forms the flexible

"tongs" in the Ohmstedt design:



Ohmstedt fig.1-2, A139.  Like the magazine 12 of Krulls, brush holder

11 is a complex structure.  The patent identifies the major components

as:

- inwardly biased legs 21 (which terminate in outwardly divergent portions 23);
- teeth 25;
- coil spring 29;
- clip 31;
- upwardly extending inclined tabs 32;
- electrically conductive male connector 35;
- screw 37;
- flexible connector 39;
- removable handle 41; and
- transparent guard 43.

*See* Ohmstedt 2:12-30 (describing such features), A141.

As discussed *supra*, in the '906 claims the term "beam" means "a

long, straight structural member designed to be rigid."  Neither brush

holder 11 nor legs 21 of the Ohmstedt device fits that definition.

Neither is "straight," as the pictures clearly demonstrate.  And,

crucially, neither is "designed to be rigid."  To the contrary, the

Ohmstedt patent describes legs 21 as "resilient," and specifically

describes that, far from being rigid, they must flex in order to properly

position the brush:

> The brush holder is a U-shaped member includ-
> ing resilient, inwardly-biased legs 21.  Each leg

62

> terminates in a free end including an outwardly divergent portion 23. . . .
>
> . . .
>
> . . . As the brush holder is mounted into the brush box, outwardly divergent portions 23, at the free ends of the brush holder, slidably engage ramps 59 to **spread apart the inwardly biased brush holder legs thereby causing the brush holder to release the brush to "float" in the rectangular portion of the brush box** . . . .

Ohmstedt at 2:12-43, A141.

Such flexure is entirely incompatible with the '906 claims' requirement that the beam be "designed to be rigid." It is also inconsistent with the functions assigned to the '906 patent's "beam." As discussed previously, the '906 patent states that the beam must "withstand the greatest forces in the design," and should be "made of more durable materials such as high tensile strength steel." '906 patent at 5:11-17, A46. The flexible, resilient legs and brush holder of the Ohmstedt device fall well outside of such guidance. As such, the '906 patent's claimed "beam" constitutes a key differentiator with the Ohmstedt patent.

## III.    REVERSAL IS WARRANTED

Reversal is warranted in this case because a finding in favor of Cutsforth would dispose of every ground of rejection at issue in the

*inter partes* review proceedings before the PTAB.  Cutsforth

respectfully submits that once this Court corrects the PTAB's errors in

applying the BRI standard it should enter the following findings:

| Krulls Finding | Result |
|---|---|
| Krulls lacks a "beam" | **All claims under review are novel over Krulls** |
| Krulls lacks a "brush catch coupled to the beam" | **All claims under review are novel over Krulls** |

| Ohmstedt Finding | Result |
|---|---|
| Ohmstedt lacks a "brush release [that] is a projection extending from the mounting block" | **All claims under review are novel over Ohmstedt** |
| Ohmstedt lacks a "brush catch [that] includes a spring" | **Claim 19 is novel over Ohmstedt** |
| Ohmstedt lacks a "beam" | **All claims under review are novel over Ohmstedt** |

The PTAB instituted *inter partes* review of the challenged of the

'906 patent on only three grounds: anticipation by Ohmstedt,

anticipation by Krulls, and obviousness over Krulls and Ohmstedt.  *See*

Dec. at 2, A2.  As explained above, neither Ohmstedt nor Krulls

anticipates the claims of the '906 patent under review.  The PTAB's

third ground of rejection pertained only to claims 12 and 13 of the '906

patent, which have since been cancelled by Cutsforth.  Order Cancelling

Claims, A585-87.  Thus, a finding in favor of Cutsforth would dispose of

every ground of rejection at issue in the *inter partes* review proceedings. As such, reversal is warranted.[12] *Cf. In re Baker Hughes, Inc.*, 215 F.3d 1297, 1303 (Fed. Cir. 2000) (reversing Board's claim construction in a reexamination proceeding and determining that remand was unnecessary).

## CONCLUSION

For the foregoing reasons, Cutsforth respectfully requests that this Court reverse the Board's rejection of the claims and find that claims 14, 16-19, 21, and 22 are not anticipated by Ohmstedt or Krulls.

---

[12] The path to any alternative ground, such as an obviousness analysis, is foreclosed. At no point did MotivePower suggest that the claims under review might be unpatentable on obviousness grounds over Ohmstedt in view of Krulls, or vice versa, and the PTAB did not institute on those grounds or consider such grounds in its Final Decision. To the extent MotivePower proposed other obviousness combinations, the Board determined not to proceed on those grounds, and that decision is not appealable. *See* Institution Decision 18, A271; *see also In re Cuozzo*, 778 F.3d 1271, 1276 (Fed. Cir. 2015) ("We conclude that § 314(d) prohibits review of a decision to institute IPR even after a final decision.").

Dated: April 7, 2015                    */s/ Mathias W. Samuel*
                                        Mathias W. Samuel
                                        Robert Courtney
                                        Conrad Gosen
                                        FISH & RICHARDSON P.C.
                                        3200 RBC Plaza, 60 South 6th St.
                                        Minneapolis, MN 55402
                                        612-335-5070

                                        *Attorneys for Appellant*
                                        *Cutsforth, Inc.*

# ADDENDUM

Trials@uspto.gov
Tel: 571-272-7822

Paper 31
Entered: October 30, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

MOTIVEPOWER, INC.,
Petitioner,

v.

CUTSFORTH, INC.,
Patent Owner.

————————————

Case IPR2013-00268
Patent 7,141,906 B2

————————————

Before TRENTON A. WARD, MIRIAM L. QUINN, and CARL M. DeFRANCO,
*Administrative Patent Judges.*

WARD, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
35 U.S.C. § 318(a) and 37 C.F.R. § 42.73

IPR2013-00268
Patent 7,141,906 B2

# I.    INTRODUCTION

## A. Background

MotivePower, Inc., Petitioner, filed a Petition to institute an *inter partes* review of claims 1, 2, 4, 5, 10–14, 16–19, 21, and 22 (the "challenged claims") of U.S. Patent No. 7,141,906 B2 (Ex. 1001, "the '906 patent") pursuant to 35 U.S.C. §§ 311–19.  Paper 1 ("Pet.").  The Board granted the Petition and instituted trial for all asserted claims.  Paper 9 ("Dec.").  Although Petitioner proposed nine grounds of unpatentability, we instituted trial on only the three following grounds:

(1) Claims 1, 2, 4, 5, 10–14, 16–19, 21, and 22 as anticipated by Ohmstedt[1];

(2) Claims 1, 2, 4, 5, 10, 11, 14, 16–19, 21, and 22 as anticipated by Krulls '155[2]; and

(3) Claims 12 and 13 as obvious over Krulls '155 and Ohmstedt.

Dec. 18.

On February 18, 2014, the Board granted the Motion to Amend the claims filed by Cutsforth, Inc., Patent Owner, in which Patent Owner requested cancellation of claims 1, 2, 4, 5, and 10–13.  Accordingly, Petitioner's challenges to these claims were rendered moot.

During trial, Patent Owner filed a Patent Owner Response ("PO Resp.") addressing the grounds involved in trial and relying on the Declaration of Thomas A. Keim, Sc. D. (Ex. 2017).  Paper 14.  Petitioner filed a Reply to Patent Owner's Response.  Paper 21 ("Pet. Reply").  An oral hearing was held on August 6, 2014, and a transcript of the hearing is included in the record.  Paper 29 ("Tr.").

---

[1] U.S. Patent No. 3,864,803 (Ex. 1003) ("Ohmstedt").

[2] U.S. Patent No. 3,387,155 (Ex. 1007) ("Krulls '155").

IPR2013-00268
Patent 7,141,906 B2

We have statutory authority under 35 U.S.C. § 6(c). This final written decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

For the reasons that follow, we determine that Petitioner has met its burden to prove by a preponderance of the evidence that claims 14, 16–19, 21, and 22 of the '906 patent are unpatentable.

### B. Related Proceedings

Petitioner indicates that the '906 patent is the subject of a co-pending federal district court case, styled *Cutsforth, Inc. v. MotivePower, Inc.*, No. 0:12-cv-01200-SRN-JSM (D. Minn.). Pet. 2. In addition, the patents listed below are related to the '906 patent and are the subject of *inter partes* review as follows:

| U.S. Patent No. | *Inter Partes* Proceeding |
|---|---|
| 7,122,935 B2 | IPR2013–00267 |
| 7,417,354 B2 | IPR2013-00270 |
| 7,990,018 B2 | IPR2013-00274 |
| 8,179,014 B2 | IPR2013-00272 |

### C. The '906 Patent

The '906 patent generally relates to a brush holder assembly for use in electrical devices and slip ring assemblies. Ex. 1001, 1:14–16. In particular, the patent describes that a brush is used in an electrical device to pass electrical current from a stationary contact to a moving contact surface, and vice versa. *Id.* at 1:20–22. The brush is in contact with a moving surface; thus, the surface of the brush wears down, reducing the quality of the electrical contact. *Id.* at 1:32–51. The

3

IPR2013-00268
Patent 7,141,906 B2

'906 patent describes that when the brush is so worn that it requires replacement, the moving contact surface may need to be halted, which may be difficult or expensive. *Id.* at 1:65–2:1. Alternatively, the '906 patent describes that maintaining the relative motion during replacement of the brush may be unsafe because of the risk of arcing and an accidental short circuit in the electrical components. *Id.* at 2:2–6. The patent, therefore, describes that it would be an advantage to remove or replace a worn brush without stopping the moving parts involved. *Id.* at 2:6–10.

One embodiment of the '906 patent describes a brush holder assembly with a mounting bracket in an "engaged" configuration, relative to a lower mount block. *Id.* at 2:58–61. For example, Figure 1 of the '906 patent, reproduced below, illustrates an "engaged" configuration where brush 12, surrounded by brush box 10, is put in contact with a conducting surface because brush spring 24 pushes the brush toward the bottom edge of box 10. *Id.* at Fig.1; 4:21–40; 6:18–32.



*Fig.1*

According to Figure 1 above, brush box 10 is affixed to beam 14, which is affixed, via a hinged attachment, to lower mount block 16. *Id.* at 4:30–34. In the

4

IPR2013-00268
Patent 7,141,906 B2

"engaged" position, as shown in Figure 1, a conductive path is formed from brush 12 through brush conductor 26, terminal 28, and conductor strap 34 (not in Figure 1 but shown in Figure 2, reproduced below). *Id.* at 7:11–14.

The '906 patent further describes a "disengaged" configuration, shown in particular with respect to Figure 2, reproduced below.



*Fig.2*

As illustrated in Figure 2 above, a hinging action takes place at certain pivot lines, such as pivot line "X," about which beam 14 moves with respect to lower mounting block 16. *Id.* at 6:45–55. In the disengaged position, conductor strap 34 breaks contact with terminal 28, thus interrupting the current flow before the brush breaks contact with the conductive surface. *Id.* at 10:64–11:5.

Claim 14, reproduced below, is illustrative of the claimed subject matter:

> 14. A brush holder assembly for holding a brush having a conductive element, the brush holder assembly comprising:
>
> a mounting block including an engagement portion;

5

a beam having an engagement portion complementary with the mounting block engagement portion, wherein the mounting block engagement portion is slidably engaged with the beam engagement portion, and wherein the beam is slidable relative to the mounting block between a first, disengaged position and a second, engaged position;

a brush catch coupled to the beam for selectively engaging the brush; and

a brush release extending from the mounting block and configured for sliding engagement with the brush catch said brush release is a projection extending frond the mounting block.

## II.    ANALYSIS

### A. *Claim Interpretation*

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear.  37 C.F.R. § 42.100(b); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).  Claim terms also are given their ordinary and customary meaning as would be understood by one of ordinary skill in the art in the context of the entire disclosure.  *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).  Also, we must be careful not to read a particular embodiment appearing in the written description into the claim if the claim language is broader than the embodiment. *See In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993) ("limitations are not to be read into the claims from the specification").

In the Decision on Institution, we interpreted the term "'mounting block'" of the '906 patent to mean "'a base for affixing to another structure.'"  Dec. 7–8.  We do not modify the construction of "mounting block" in this decision.  Regarding

IPR2013-00268
Patent 7,141,906 B2

the terms "beam" and "projection extending from the mounting block," Patent Owner argues that the constructions should be modified. Each of those terms is analyzed in turn.

### 1. "beam"

Patent Owner argues that the term "beam" should be construed as "a long, straight structural member designed to be rigid." PO Resp. 9–10. More particularly, Patent Owner argues that mechanical engineering textbooks and dictionaries define a "beam" as "'a structural member the length of which is long compared with its cross-sectional dimensions . . . [and that is] used to carry transverse and lending loads.'" PO Resp. 11–12 (citing Ex. 2016). Furthermore, Patent Owner relies upon the testimony of its expert, Dr. Thomas A. Keim, stating that the term "beam" refers to a rigid element. PO Resp. 11–12 (citing Ex. 2017 ¶ 89). Additionally, Patent Owner quotes the statement in the '906 patent Specification that the "beam" be constructed of stainless steel to provide high strength and durability. PO Resp. 14 (citing Ex. 1001, 5:4–17). As to requiring that the beam be "straight," Patent Owner argues that a mechanical engineering textbook notes that a beam "'is straight or nearly so'" and "'long in proportion to its depth.'" PO Resp. 12 (citing Ex. 2010, 89).

Petitioner disagrees and argues that Patent Owner is attempting to improperly narrow the term "beam." Furthermore, Petitioner argues that the term "beam" should be given its plain and ordinary meaning of an "elongated support structure." Pet. Reply 8. Petitioner further argues that the portions of the Specification quoted by Patent Owner do not require "rigid" materials because the Specification expressly states that, although in "some embodiments" stainless steel can be used for the beam, "other materials, including other metals, non metals, *plastics* and/or composites may also be used." Pet. Reply 5–6 (citing Ex. 1001,

5:4–11) (emphasis added).  Therefore, we are not persuaded by Patent Owner to read a limitation recited in the Specification for "some embodiments" into all embodiments encompassed by the claims.  Ex. 1001, 5:4–11.  As to the Patent Owner's proposal that the term "beam" includes a requirement that it be "long" and "straight," Patent Owner fails to cite to any disclosure in the Specification of the '906 patent that any embodiments of the "beam," much less all embodiments, must be long and straight.  Furthermore, Patent Owner provides neither an indication of what constitutes a sufficiently straight or sufficiently long beam nor any citations to disclosure in the '906 patent or other materials defining those limitations.  For example, because beam 14 in the '906 patent Specification is not "straight" in all directions, we presume that Patent Owner does not propose that the "beam" be "straight" in all directions, but the Patent Owner Response fails to identify which axis of the "beam" is to be "straight."

In view of the foregoing, we construe the term "beam" of the '906 patent to mean "an elongated support structure."

2.     *"beam" and "brush catch"*

Patent Owner argues that "beam" and "brush catch" must be construed as distinct physical structures.  PO Resp. 8.  Petitioner agrees that the "beam" and "brush catch" cannot refer to identical structures, but Petitioner further argues that the "brush catch" can be a sub-component of the "beam" that is attached to or integral with the beam.  Pet. Reply 2.

We agree with Petitioner.  Patent Owner fails to cite any statements from the Specification of the '906 patent that prohibit the "brush catch" from being a sub-component of the "beam."  Accordingly, we are not persuaded by Patent Owner's contention that the claim language requires that the "brush catch" be a distinct

physical structure in all embodiments and cannot be a sub-component of the "beam" that is coupled, integrally or otherwise, to the beam.

### 3. *"projection extending from the mounting block"*

Patent Owner argues that the phrase "projection extending fro[m] the mounting block" in claim 14 should be construed as "a structure that protrudes outwardly from the mounting block." Prelim. Resp. 12. Thus, Patent Owner seeks a construction of the phrase that limits the direction to which the projection extends to include only "outwardly" protruding extensions. *See* Prelim. Resp. 12. Patent Owner fails to provide any support in the '906 patent Specification to require this narrowed construction and only cites to a definition of "projection" as "a projecting or protruding part." *Id*. at 12. We agree with Patent Owner that the phrase should be construed according to its plain and ordinary meaning, but we do not agree that the term "projection" is limited to an "outward" projection in a certain direction. As we determined in the Decision on Institution, we conclude that the phrase "projection extending from the mounting block" is not limited only to projections extending outwardly from the mounting block. Dec. 8–9.

### B. *Anticipation by Ohmstedt*

With respect to the alleged ground of unpatentability based on anticipation by Ohmstedt, we have reviewed the Petition, the Patent Owner Response, and Petitioner's Reply, as well as the relevant evidence discussed in each of those papers.

### 1. *Overview of Ohmstedt (Ex. 1003)*

Ohmstedt discloses a brush mounting device that allows "brush maintenance [to] occur while the machine is under load and voltage is applied to the brushes." Ex. 1003, 2:64–66. Figure 1 of Ohmstedt is reproduced below.

IPR2013-00268
Patent 7,141,906 B2



FIG.1

As shown above in Figure 1, Ohmstedt discloses a brush mounting device that includes brush holder 11 having brush 27 and brush box 13 attached to bus ring 15. Ex. 1003, 2:5–7. Ohmstedt discloses that brush box 13 is fixed to bus ring 15, but brush holder 11 and brush 27 are removable from brush box 13 and the dynamoelectric machine. Ex. 1003, 2:59–62. Furthermore, Ohmstedt discloses that brush holder 11 provides divergent portions 23 that can engage, slidably, ramps 59 to cause the brush holder to release the brush, which "float[s]" in the rectangular portion of the brush box and is in contact with the collector ring under pressure exerted by coil spring 29. Ex. 1003, 2:37–44. Additionally, Ohmstedt

10

discloses inwardly extending teeth 25 for tightly gripping the electrically conductive brush 27.  Ex. 1003, 2:15–17.

> 2.  *Analysis*

Concerning independent claim 14, Petitioner contends that Ohmstedt discloses a mounting block (brush box 13) having an engagement portion (pair of slots 57) and a beam (brush holder 11) including an engagement portion (biased legs 21) complimentary with the mounting block engagement portion, wherein the beam (brush holder 11) is slidable relative to the mounting block (brush box 13) between a first, disengaged position and a second, engaged position.  Pet. 14 (citing Ex. 1003, 2:5–49, 3:8–12, Figs. 1, 2).  Furthermore, Petitioner contends that Ohmstedt discloses the claimed "brush catch coupled to the beam" by disclosing that "each leg [21] includes inwardly extending teeth 25 for tightly gripping an electrically conductive brush 27."  Pet. 16 (citing Ex. 1003, 2:12–17).  Additionally, Petitioner contends that Ohmstedt discloses the claimed "brush release extending from the mounting block" by disclosing a brush release (ramps 59) extending from the mounting block (brush box 13) configured for sliding engagement with the brush catch (outwardly extending portions 23, teeth 25) and the brush release (ramps 59).  Pet. 16 (citing Ex. 1003, 2:5–49, 3:2–12, Figs. 1, 2).  Patent Owner argues the disclosures cited from Ohmstedt fail to anticipate the challenged claims.  We address Patent Owner's arguments in turn.

First, Patent Owner argues that Ohmstedt fails to disclose a beam that is distinct from a brush catch.  PO Resp. 20.  More particularly, Patent Owner argues that claim 14 requires a "beam" and a "brush catch coupled to beam" and that there must be a physical distinctness between the beam and the brush catch.  PO Resp. 20–21.

We are not persuaded by Patent Owner's argument. As construed above, the claimed "brush catch" can be provided as an integral sub-component of the "beam." As shown in Figure 1 of Ohmstedt above, outwardly extending portions 23 and teeth 25 are sub-components of biased legs 21 provided at the bottom of biased legs 21. Ex. 1003, Fig. 1. Accordingly, we determine that the cited Ohmstedt disclosures meet the limitations of a "beam" and a "brush catch."

Second, Patent Owner argues that Ohmstedt does not disclose a "beam," as recited in claim 14. PO Resp. 23. Specifically, Patent Owner argues that neither brush holder 11 nor inwardly biased legs 21 of Ohmstedt are "long, straight structural members designed to be rigid." PO Resp. 23. We are not persuaded by Patent Owner's argument. As discussed above, we do not adopt Patent Owner's proposed construction of "beam" to mean "a long, straight structural member designed to be rigid." We construe "beam" to mean an "elongated support structure," and Patent Owner does not dispute that brush holder 11, disclosed in Ohmstedt, provides an "elongated support structure." Accordingly, we are persuaded that Ohmstedt's brush holder 11, identified by Petitioner in its challenge for the beam (Pet. 14), discloses this "beam" limitation.

Third, Patent Owner argues that Ohmstedt does not disclose a "brush release" that is a "projection extending fro[m] the mounting block," as recited in claim 14. PO Resp. 25–26. More particularly, Patent Owner argues that Ohmstedt's ramps 59 ("projections") are inset into brush box 13 ("mounting block") and do extend from it. PO Resp. 26–27. Patent Owner contends that ramps 59 from Ohmstedt, relied upon by Petitioner for the "brush release" limitation, are simply slopes or inclines into the material of brush box 13 that do not project. PO Resp. 29. At the Oral Hearing, Patent Owner stated that projecting from the mounting block requires "projecting from an outer surface of the block."

IPR2013-00268
Patent 7,141,906 B2

Tr. 75:15–18.

As discussed above, we do not adopt Patent Owner's proposed construction of "projection extending from the mounting block" and conclude that the phrase is not limited only to projections extending outwardly from the mounting block. Ramps 59, disclosed in Ohmstedt, project from a surface of the mounting block (brush box 13) so as to intersect with divergent portions 23 of biased legs 21. Pet. 16 (citing Ex. 1003, 2:5–49, 3:2–12, Figs. 1, 2); Tr. 44:13–22. Therefore, we are not persuaded by Patent Owner's argument that Ohmstedt fails to disclose the claimed "projection extending from the mounting block."

With respect to the recitation in claim 19 that the "brush catch includes a spring," Petitioner relies upon Ohmstedt's disclosure of inwardly biased legs 21, divergent portions 23, and teeth 25. Pet. 17 (citing Ex. 1003, 2:12–17, Figs. 1, 2). Furthermore, Petitioner argues that biased legs 21 are forced outward by brush release 59, and that, when biased legs 21 are removed, they retain, or spring, to their original inwardly biased shape, allowing teeth 25 to contact the brush. *Id*. Patent Owner does not disagree, and concedes that Ohmstedt's "legs 21 are configured to exert opposing inward *spring* forces that retain a brush 27 until bent outward." PO Resp. 19 (emphasis added). Accordingly, we determine that the cited Ohmstedt disclosures meet the limitation of a "brush catch [that] includes a spring."

As for the remaining elements recited in claims 14, 16–19, 21, and 22, which were not disputed by Patent Owner, we also find that Ohmstedt discloses those elements according to the comparisons between the Ohmstedt disclosures presented in the Petition and the claim limitations. *See* Pet. 14–18. For the foregoing reasons, we conclude that Petitioner has demonstrated by a

13

preponderance of the evidence that claims 14, 16–19, 21, and 22 are anticipated by Ohmstedt.

### C. Anticipation by Krulls '155

With respect to the alleged ground of unpatentability based on anticipation by Krulls '155, we have reviewed the Petition, the Patent Owner Response, and Petitioner's Reply, as well as the relevant evidence discussed in each of those papers.

#### 1. Overview of Krulls '155 (Ex. 1007)

Krulls '155 relates to a removable brush magazine arrangement for holding and replacing brushes in a dynamoelectric machine. Ex. 1007, 1:11–13. Krulls '155 discloses removable brush magazine 12 and stationary structure 14 for supporting the magazines and allowing brushes 40 to contact collector ring 54. Ex. 1007, 2:11–13. Figures 1–4 of Krulls '155 are reproduced below.



As shown in Figures 1–4 above, Krulls '155 discloses cross-bus bars 30 having slot 70 with engagement portion 78. Ex. 1007, 3:47–38; 3:74–4:4. When brush magazine 12 is moved into its operating position, the engagement portion 78 of slot 70 deflect legs 66 of magazine 12, which "causes the tab 72 [of the brush magazine 12] to be withdrawn from under the lower end 76 of the brush, thereby

releasing the brush as shown in FIG. 3 to engage the collector ring 54." Ex. 1007, 4:3–11. Accordingly, brush magazine 12 retains brush 40 until releasing it to contact collector ring 54 when magazine 12 is moved into its operating position. *Id.*

### 2. *Analysis*

With respect to claim 14, Petitioner argues that Krulls '155 discloses a mounting block (cross-bus bar 30) with an engagement portion (slot 70 with engagement portion 78), a beam (brush magazine 12) with an engagement portion (U-shaped free ends 69), a brush catch (right angle tab portion 72), and a brush release (engagement portion 78) for sliding engagement with the brush catch. Pet. 25–28 (citing Ex. 1007, 3:74–4:11). Specifically, Petitioner relies upon the Krulls '155 disclosure of outer legs 66 that are inserted in slot 70 and engaged by a portion of cross-bus bar 30, such that they are deflected away from the front of the brush magazine, which "causes the tab 72 to be withdrawn from under the lower end 76 of the brush, thereby releasing the brush." Pet. 25–28 (quoting Ex. 1007, 3:74–4:11). Patent Owner argues that the disclosures cited from Krulls '155 fail to anticipate the challenged claims. We address Patent Owner's arguments in turn.

First, similar to the arguments made against anticipation by Ohmstedt, Patent Owner argues that Krulls '155 fails to disclose a "brush catch" that is a separate physical structure from the "beam." PO Resp. 33. More particularly, Patent Owner argues that Petitioner argues incorrectly that resilient member 56 of Krulls '155 is both the "beam" and "brush catch." PO Resp. 33.

We are not persuaded by Patent Owner's argument. As properly construed, the claimed "brush catch" can be provided as an integral sub-component of the "beam." Accordingly, Petitioner relies upon right angle tab portion 72, an integral sub-component of resilient member 56 of brush magazine 12, as the "brush catch."

As shown in Figure 4 of Krulls '155 above, right angle tab portion 72 is provided at the bottom of resilient member 56. Ex. 1007, Fig. 4. Accordingly, we determine that the cited disclosures in Krulls '155 meet the limitations of a "beam" and a "brush catch."

Second, Patent Owner argues that Krulls '155 does not disclose a "beam," as recited in claim 14. PO Resp. 35. Specifically, Patent Owner argues that neither brush magazine 12 nor resilient member 56 of Krulls '155 is a long, straight structural member designed to be rigid. PO Resp. 35. We are not persuaded by Patent Owner's argument. As discussed above, we do not adopt Patent Owner's proposed construction of "beam" to mean "a long, straight structural member designed to be rigid." We construe "beam" to mean an "elongated support structure" and Patent Owner does not dispute that the brush magazine disclosed in Krulls '155 provides an "elongated support structure." Accordingly, we are persuaded that the brush magazine 12 having resilient members 56 disclosed in Krulls '155, identified by Petitioner in its challenge for the beam (Pet. 25–26), discloses this "beam" limitation.

Third, Patent Owner argues that Krulls '155 does not disclose that the mounting block engagement portion is slidably engaged with the beam engagement portion and a brush release for sliding engagement with the brush catch, as recited in claim 14. PO Resp. 37. More particularly, Patent Owner argues that the cited portion of Krulls '155 just shows one engagement, the engagement of resilient member 56 with cross-bus bar 30, not the engagement of the mounting block with the beam and the separate engagement of the brush release with the brush catch. *Id.*

IPR2013-00268
Patent 7,141,906 B2

Contrary to Patent Owner's arguments, Petitioner relies upon engagement of outer legs 66 in Krulls '155 with slot 70 of cross bus-bar 30 for the claim limitation of "beam is slidable relative to the mounting block," and Petitioner relies upon the sliding of tab 72 away from the brush to release the brush for the claim limitation of a brush release "configured for sliding engagement with the brush catch."  Pet. 26, 28 (citing Ex. 1007, 3:65–72, 3:73–4:11).  Accordingly, we are persuaded that Krulls '155 discloses both a "beam [that] is slidable relative to the mounting block" and a brush release "configured for sliding engagement with the brush catch."  *Id.*

With respect to the recitation in claim 19 that the "brush catch includes a spring," Petitioner relies upon the disclosure in Krulls '155 of resilient members 56 having outer legs 66 and center legs 68.  Pet. 29 (citing Ex. 1007, 3:73–4:11, Figs. 1, 2).  Furthermore, Petitioner argues outer legs 66 and center legs 68 retain, or spring, to their original inwardly biased shape when disengaged from slot 70.  *Id.* Patent Owner concedes that Krulls '155 discloses that "resilient members 56 are designed to bend and flex in order to release the brushes 40 from the removable brush magazine."  PO Resp. 32.  Accordingly, we determine that the cited Krulls '155 disclosures meet the limitation of a "brush catch [that] includes a spring."

As for the remaining elements recited in claims 14, 16–19, 21, and 22, which were not disputed by Patent Owner, we also find that Krulls '155 discloses those elements according to the comparisons between the Krulls '155 disclosures presented in the Petition and the claim limitations.  *See* Pet. 25–30.  For the foregoing reasons, we conclude that Petitioner has demonstrated by a preponderance of the evidence that claims 14, 16–19, 21, and 22 are anticipated by

18
**A0018**

IPR2013-00268
Patent 7,141,906 B2

Krulls '155.

## III.   CONCLUSION

Petitioner has demonstrated, by a preponderance of the evidence, that (1) claims 14, 16–19, 21, and 22 of the '906 patent are anticipated by Ohmstedt and (2) claims 14, 16–19, 21, and 22 of the '906 patent are anticipated by Krulls '155.


## IV.   ORDER

Accordingly, it is hereby:

ORDERED that Petitioner has shown by a preponderance of the evidence that claims 14, 16–19, 21, and 22 of the '906 patent are unpatentable; and

FURTHER ORDERED that the parties to the proceeding seeking judicial review of this Final Written Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2013-00268
Patent 7,141,906 B2


PETITIONER:

Jason A. Engel (Lead Counsel)
Alan L. Barry (Backup Counsel)
Benjamin Weed (Backup Counsel)
K&L GATES LLP
Jason.engel@klgates.com
alan.barry@klgates.com
benjamin.weed.PTAB@klgates.com


PATENT OWNER:

W. Karl Renner (Lead Counsel)
Dorothy P. Whelan (Backup Counsel)
Mathias Samuel (Backup Counsel)
FISH & RICHARDSON P.C.
axf@fr.com
Whelan@fr.com
PTABInbound@fr.com
samuel@fr.com


20



US007141906B2

(12) **United States Patent**
Custforth et al.

(10) Patent No.: **US 7,141,906 B2**
(45) Date of Patent: **Nov. 28, 2006**

(54) **BRUSH HOLDER APPARATUS, BRUSH ASSEMBLY, AND METHOD**

(75) Inventors: **Robert S. Custforth**, Bellingham, WA (US); **David L. Cutsforth**, Cohasset, MN (US)

(73) Assignee: **Cutsforth Products, Inc**, Cohasset, MN (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 150 days.

(21) Appl. No.: **11/172,315**

(22) Filed: **Jun. 30, 2005**

(65) **Prior Publication Data**
US 2005/0242684 A1    Nov. 3, 2005

**Related U.S. Application Data**

(63) Continuation of application No. 10/322,957, filed on Dec. 18, 2002.

(60) Provisional application No. 60/342,175, filed on Dec. 18, 2001.

(51) **Int. Cl.**
*H20K 13/12*    (2006.01)

(52) **U.S. Cl.** ...................... **310/229**; 310/240; 310/239; 310/230; 310/242; 310/244; 310/247; 310/245

(58) **Field of Classification Search** ............... 310/229, 310/239, 240, 244, 247, 245
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,296,346 A    10/1981    Ooki et al.

| | | | | |
|---|---|---|---|---|
| 4,633,552 A | * | 1/1987 | Eriksson | .................. 407/29.15 |
| 5,939,812 A | * | 8/1999 | Wetzel | ........................ 310/245 |
| 6,124,652 A | * | 9/2000 | Karasa et al. | .................. 310/50 |
| 6,133,665 A | * | 10/2000 | Prell et al. | .................. 310/239 |
| 6,246,145 B1 | * | 6/2001 | Morimoto et al. | .......... 310/245 |
| 6,255,955 B1 | | 7/2001 | Blaettner | |
| 6,326,716 B1 | | 12/2001 | Niimi et al. | |
| 6,356,004 B1 | | 3/2002 | Porter et al. | |

FOREIGN PATENT DOCUMENTS

EP    0 847 126    6/1998

OTHER PUBLICATIONS

Documents depicting brush holder designs, sent by applicant on Apr. 5, 2002.
Documents depicting various process of electropolishing, sent by applicant on Dec. 17, 2002.

* cited by examiner

*Primary Examiner*—Darren Schuberg
*Assistant Examiner*—Iraj A. Mohandesi
(74) *Attorney, Agent, or Firm*—Crompton, Seager & Tufte, LLC

(57)    **ABSTRACT**

Devices and methods of use for brush holders are disclosed. A brush holder assembly including a brush catch and a brush release is disclosed. Also illustrated is a brush holder assembly including a first portion in sliding engagement with a second portion. Sliding engagement of the first portion with the second portion may selectively engage and/or disengage a brush catch with a brush. In some embodiments the brush catch is disengaged from the brush when the brush holder is in a locked position and is engaged with the brush when the brush holder is in an unlocked position. Methods and devices for selectively placing a brush holder in a locked or unlocked position are also disclosed.

**27 Claims, 22 Drawing Sheets**



A0021



*Fig.1*



*Fig.2*



Fig.3



Fig. 4A



*Fig.4B*



*Fig.4C*

A0027



*Fig.5*



Fig.6



*Fig.7*

A0030



*Fig.8A*



*Fig.8B*



Fig. 9



*Fig.10*



*Fig.11*



*Fig.12*

A0036



*Fig.13A*



*Fig.13B*



*Fig.13C*



*Fig.14*

**A0038**



Fig.15A



*Fig.15B*

A0040



*Fig.16A*



*Fig.16B*

**A0042**

Case: 15-1314    Document: 18    Page: 117    Filed: 04/07/2015



*Fig.17A*



*Fig.17B*



*Fig.17C*

US 7,141,906 B2

1

## BRUSH HOLDER APPARATUS, BRUSH ASSEMBLY, AND METHOD

### REFERENCE TO RELATED APPLICATIONS

This application is a continuation of copending U.S. patent application Ser. No. 10/322,957, filed Dec. 18, 2002; which claims priority to provisional application 60/342,175, filed Dec. 18, 2001, which are incorporated herein by reference.

### FIELD OF THE INVENTION

The invention relates to a brush assembly. More specifically, the invention relates to a brush holder assembly that may be used in electrical devices and/or slip ring assemblies.

### BACKGROUND

The purpose of a brush in an electrical device is to pass electrical current from a stationary contact to a moving contact surface, or vice versa. Brushes and brush holders are used in electrical devices such as electrical generators and electrical motors of all sizes. They are also used on slip ring assemblies, for example, slip ring assemblies on a rotating machine such as a rotating crane. Brushes in many electrical devices are blocks or other structures made of conductive material, such as graphite, carbon graphite, electrographite, metal graphite, or the like, that are adapted for continuous contact with a conductive surface to pass electrical current. A brush typically includes one or more electrical shunts or wires to provide an electrical current path from the brush to other structure. Typically a brush assembly provides for continuing contact between a stationary brush and a moving conductive surface, or vice versa. Over time, the brush will be reduced in size, or get shorter, for example as the contact surface of the brush wears down. It would be desirable to provide a brush assembly that allows for continuing good contact even as the brush wears down, and which enables quick, safe replacement of brushes.

In many designs, a brush box type brush holder is used to support the brush during operation. The brush and box are designed such that the brush can slide within the box to provide for continuing contact between the brush and the conductive surface contacted by the brush. During wear of a brush, fine particles and/or dust can be created, which can collect on nearby surfaces and the inside of the brush box. Such material can create deposits of brush material on the inside of the brush box that can restrict sliding movement of the brush within the box, which in turn can reduce the quality of the contact between the brush and the contact surface. It would be desirable to provide a brush assembly that allows for a reduction of such restriction in movement of the brush. Additionally, it would be desirable to provide a brush assembly which does not allow current to pass through the box to thereby avoid detrimental effects, such as electrical erosion of the surfaces of the box, or collection of deposits on the surface of the box, which can restrict movement of the brush within the box.

Further, typically such boxes include a back plate which is used to enable a spring to press the brush against a conductive surface. It would also be desirable to provide a brush assembly which can function without requiring a back plate.

In some instances a brush may become so worn as to require replacement. In some such cases, for example in power generation, it may be difficult or expensive to stop the

2

motion of the moving conductive surface to replace the brush. However, removal of the brush while relative motion between the brush and the conductive surface is ongoing can create a risk of arcing between the brush and the conductive surface, or can create a risk of accidental short circuiting the flow of electricity in other components. It would be desirable to provide a brush assembly that allows for safe, easy removal and replacement of a worn brush without requiring an adjacent collector ring, commutator or other moving part to be stopped.

### SUMMARY

Some example embodiments relate to a brush holder and brush that can be readily removed from service without removing attachment hardware such as nuts or bolts. Additional example embodiments pertain to a brush holder that provides a mechanism for retaining a brush in the holder as the assembly is removed. In some such embodiments, the brush is contained within the brush holder assembly during removal, thereby providing for a more contained system that is easier to deal with and control during removal, thereby reducing the likelihood of accidental short circuiting of electrical current flow during a removal process. Additionally, in some such embodiments, the more contained system allows operations such as the removal of the brush assembly and/or the replacement or repair of a brush to be performed in a shorter period of time and with greater ease.

Other example embodiments relate to a brush holder including a replaceable contact system. Some example embodiments pertain to an assembly for attaching a brush spring while eliminating the need for back plate. Other example embodiments pertain to a brush holder using an insulation scheme to control the flow of current so that current does not pass through the brush box.

Some example embodiments pertain to a locking structure to ensure the holder stays locked in place. Several example locking structures include an over-center spring or tension-loaded device that does not release unless a force is applied to overcome the over-center force. Some example locking structures include a safety tab for interacting across a hinged or pivoting portion of a brush holder to prevent motion of the hinge or pivot unless a safety release device is used to release or move the safety tab.

Additional embodiments include features to prevent arcing between a brush and a conductive surface during removal of a brush while relative motion between the brush and the conductive surface continues. Some embodiments include mechanisms that allow for replacement of conductive and/or tension mechanisms within a brush holder structure when a brush wears out, simplifying the process of maintaining such elements. Some such embodiments provide for quick, unobstructed access to the inside of a brush box included in the assembly for cleaning and maintenance.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is drawing showing a perspective view of a brush holder assembly in accordance with one example embodiment, showing the mounting bracket in an engaged configuration relative to the mount block;

FIG. **2** is a drawing showing a perspective view of the brush holder assembly of FIG. **1**, showing the mounting bracket in a disengaged configuration relative to the mount block;

FIG. **3** illustrates a perspective view of an example brush and spring for use with several embodiments;

<table>
<tr><td>3</td><td>4</td></tr>
</table>

FIGS. **4A**–**4B** illustrate perspective views of attachment of a spring similar to that shown in FIG. **3** to an illustrative beam of an example brush holder assembly;

FIG. **4C** illustrates a perspective view of an illustrative terminal connecting to an illustrative beam;

FIG. **5** illustrates a perspective view where several elements of the illustrative embodiment have been omitted to highlight conductive elements as coupled together when an example mounting bracket is in an engaged position relative to a mount block;

FIG. **6** illustrates a perspective view similar to that of FIG. **5** except that the conductive elements are shown including a disconnection between certain elements because the mounting bracket is in a disengaged position relative to the mount block;

FIG. **7** illustrates a perspective view highlighting a small portion of the perspective view shown in FIG. **2** including a safety locking apparatus;

FIGS. **8A**–**8B** illustrate perspective views of a removal apparatus for use with several embodiments;

FIG. **9** illustrates a perspective view of the interaction between a removal apparatus similar to that of FIG. **8** with a safety locking apparatus similar to that of FIG. **7** during a disengagement manipulation;

FIG. **10** illustrates a perspective view of a terminal for use in several embodiments;

FIG. **11** illustrates a cut-away view of an illustrative brush-catch mechanism used in some embodiments, with the brush-catch mechanism retracted;

FIG. **12** illustrates extension of a brush-catch mechanism similar to that shown in FIG. **11** to engage a brush;

FIGS. **13A**–**13C** illustrate highly schematic views highlighting the over-center locking mechanism used in several embodiments;

FIG. **14** illustrates a perspective view of a lower mount block for use in several embodiments;

FIG. **15A** illustrates an upper mount block which can be attached to the lower mount block illustrated in FIG. **14**;

FIG. **15B** illustrates a partially exploded view of attachment of upper mount block of FIG. **14** to the lower mount block of FIG. **15A**, and attachment of lower mount block to a mount base;

FIGS. **16A**–**16B** illustrate perspective views of a upper beam which can mate with a removal tool as in FIG. **8**; and

FIGS. **17A**–**17C** illustrate highly schematic views of an alternative over-center design in which the brush does not tip.

## DETAILED DESCRIPTION OF SOME EMBODIMENTS

The following detailed description should be read with reference to the figures, in which like elements in different figures are numbered in like fashion. The figures, which are not necessarily to scale, depict selected embodiments and are not intended to limit the scope of the invention. In some cases, the figures may be highly diagrammatic in nature. Examples of constructions, materials, dimensions, and manufacturing processes are provided for various elements, but are not intended to limit such elements to particular manufactures. Those skilled in the art will recognize that many of the examples provided have suitable alternatives that may be utilized.

As used herein, the terms "upper portion" and "lower portion" are intended as merely illustrative terms which may provide a frame of reference for explanations of the drawings and claims. Merely placing an element "upside-down"

does not change the inventive concepts herein. Also as used herein, the term "box" does not refer to a particular structure or enclosure. As illustrated in several of the Figures, a box may include a first side, a second side, and a center portion attached between and at approximately right angles to the first and second sides. Often the term box will refer to a shielding or other piece of material that may surround another element on several sides. The term "adjacent" includes relatively close proximity, but does not imply contact between two elements which are adjacent to one another.

The following detailed description is believed to describe a number of distinct inventions and inventive concepts. Each of the following inventions are illustrated herein as different aspects of one illustrative embodiment. The several inventions detailed below may be used in isolation from one another to accomplish a variety of tasks. Their inclusion in an individual example together should not be interpreted as requiring use of any one invention with any other inventive concept disclosed herein.

FIG. **1** is drawing showing a perspective view of a brush holder assembly in accordance with one example embodiment, showing a beam **14** in an engaged configuration relative to a lower mount block **16**. As used herein, an engaged configuration is one in which a brush holder assembly is configured to place a brush such as the brush **12** in contact with a conductive surface **13**, such as a surface of a collector ring or commutator, and conduct current therefrom. A brush box **10** surrounds the brush **12** on several sides, and is affixed to the beam **14**. The box **10** includes inner surfaces that are adapted to slidingly engage the outer surfaces of the brush **12**, and allow the brush to be biased into contact with the surface **13** when the beam **14** is in the engaged configuration relative to a lower mount block **16**. The beam **14** is hingedly attached to the lower mount block **16**. In several embodiments, the beam **14** may be completely removed/separated from the lower mount block **16**. For example, the beam **14** may include one or more posts which fit into grooves in the lower mount block **16**, the post being part of the beam **14** to create pivot line X.

The beam **14** is also hingedly attached to an upper beam **18**. The hinged attachment may be at about pivot line Y. The upper beam **18** couples to an upper mount block **20**, forming another hinge corresponding to pivot line Z. The upper mount block **20** engages the lower mount block **16** as better seen in FIG. **2**. A safety catch **22** is fixed to the beam **14** as well, and extends past pivot line Y to pass alongside the upper beam **18**. A portion of the safety catch **22** can engage a ledge **30** which is a part of the upper beam **18**. A notch **32** is also part of the upper beam **18**. Some illustrative examples of characteristics and methods for using the safety catch **22** and notch **32** are further noted below in text associated with FIGS. **7**–**9** and **15A**–**15B**.

Also illustrated in FIG. **1** is a brush spring **24**, which attaches to the beam **14**, for example as shown in FIGS. **4A**–**4B**. The brush spring **24** provides tension to the brush **12**, as noted below in FIG. **3**, to bias the brush toward the conductive surface **13**, such as the surface of a collector ring or commutator. The inner surfaces of the box **10** that engage the brush are adapted or configured to allow the brush **12** to slide within the box. One or more brush conductor or shunt **26** provides a current path for electrical signal from the brush **12**. In some applications, it may be useful to direct current from the brush **12** to another location without passing the current through the brush box **10**, for example, to reduce electrical erosion of the surfaces of the box **10**. As shown, a brush conductor **26** couples to a terminal **28**, which

US 7,141,906 B2

**5**

is another portion of a current path provided in several embodiments, as further highlighted in FIGS. 5–6.

The various elements noted in FIG. 1 may be constructed of any of a variety of suitable materials. In some embodiments, one or more of the box 10, beam 14, lower mount block 16, upper mount 18 and upper mount block 20 may be constructed of a metal such as stainless steel, for example heat treated stainless steel, to provide high strength, durability, and corrosion resistance. However, other materials, including other metals, non-metals, plastics and/or composites may also be used. In some embodiments, different parts may be of different materials having different properties, for example, the box 10 may be a non-conductive, light-weight composite, while the beam 14 and lower mount block 16, which must withstand the greatest forces within the design, are made of more durable metals such as high tensile strength steel.

Several parts may also include non-conductive or conductive coatings, polishes, anti-corrosive coatings, or coatings such as Teflon or the like, which may inhibit accumulation of dirt and/or debris, inhibit corrosion, or provide a smooth or slippery surface. Several parts may also include surfaces that have been treated or finishing to inhibit accumulation of dirt and/or debris, inhibit corrosion, or provide a smooth or slippery surface.

For example, some embodiments may include one or more components or parts that include a surface that is electropolished. Electropolishing is a nonmechanical method of polishing metal surfaces that is actually the reverse of electroplating. It is an electro-chemical process that mechanically restructures the surface of a metal by expelling electrons from the exposed surface and causing a smoothing reaction. Surface metal is removed by anodic dissolution. This is achieved by making the object or portion of the brush holder assembly to be polished the anode in an electrolytic circuit, the cathode being of suitable material, for example, copper, carbon, or the like. The cathode is typically assembled to mirror the surface of the piece being polished. The electrode potential of the metal piece is altered, typically within a heated electrolyte bath. Suitable electrolytes are used, for example, polishing acids, for example, phosphoric, hydrofluoric, nitric, or sulfuric acids, or the like, or combinations thereof. The anode and cathode are typically submersed in a plating bath including the electrolytes, and an electrical current is passed through the system to dissolve material from the surface of the anode, and deposit material onto the cathode. The plating bath may be heated, as is generally known, and agitation of the system can be created, for example, through blowing air through the bath.

One aspect to the electropolishing process is the difference in current densities across the microscopic surface being treated. The current density is greatest at high points and lowest at the low points. The rate of the electrochemical reaction is directly proportional to the current densities. The increased current density at the raised, or high points causes metal to dissolve faster at these points and thus levels, or smoothens, the surface material.

In some embodiments, the process is so refined that removal of material can be controlled within the range of about 0.0001 inch to about 0.0005 inch. Some surfaces can be obtained that become non-particulating surfaces, for example, that are so smooth that at least some particles cannot be entrapped and adhere to the metal surface. Additionally, electropolishing can promote corrosion resistance by removing surface contaminants and promoting the formation of a uniform and protective passive oxide layer.

**6**

Such surface treatments or coatings can be particularly useful when applied to or used on the inner surfaces of the brush box 10 that may come into contact with the surfaces of the brush 12. It is desirable that the brush 12 is able to slide within the box 10 to be biased into contact with the surface 13 when the beam 14 is in the engaged configuration relative to a lower mount block 16. Such coatings or treatments may enhance and preserve the ability of the brush to slide within the box. For example, if the inner surface of the brush box is polished, coated, or treated as discussed above, in at least some embodiments, there will be less likelihood that particles and/or dust can collect on the surfaces on the inside of the brush box and create deposits that can restrict movement of the brush within the box. Additionally, the polished, coated or treated surfaces may be smoother or more lubricious, and therefore allow for better movement of the brush within the box.

In an illustrative use of the embodiments shown in FIG. 1, the lower mount block 16 may be attached to a fixed mount (for example, as shown in FIG. 15B). Referring back to FIG. 1, the mount may be placed close relative to a moving conductive surface 13 such as the surface of a collector ring of commutator, for example, in uses having a slip ring, in generators, or in an electric motor. The mount may be placed such that, when the "engaged" embodiment as shown in FIG. 1 is attached to a mount, the brush 12 is forced or biased against a moving conductive surface 13. In other embodiments, the lower mount block 16 may be affixed to a moveable mount which then moves with respect to a fixed conductive surface. In still other embodiments, relative motion between a mount and a conductive surface may include movement of both elements.

The brush spring 24 provides force that pushes the brush 12 toward the bottom edge of the brush box 10 as shown by arrow 11. The force provided by the brush spring 24 may be augmented by other biasing structures in some embodiments, while in other embodiments the brush spring 24 may by itself provide force to the brush 12 without other structure.

The brush 12 is shown extending past the bottom edge of the brush box 10. This enables a portion of the brush 12 to be supported by the brush box 10, while also allowing the brush 12 to engage and contact an adjacent conductive surface 13 without damaging the bottom of the brush box 10.

FIG. 2 is a drawing showing a perspective view of the brush holder assembly of FIG. 1, showing the beam 14 in a disengaged configuration. Again illustrated is the brush box 10 which houses the brush 12 and is affixed to the beam 14. In a transition from the engaged configuration of FIG. 1 to the disengaged configuration of FIG. 2, hinging action takes place at each pivot line X, Y, and Z. Notably, lines X and Y have moved with respect to the lower mount block 16. Movement of the bottom of the brush box 10 exposes a groove 38, which may be included to allow a post on beam 14 to slidably fit in the groove 38 to create pivot line X.

While the brush spring 24 continues to apply force to the brush 12, a brush catch mechanism (not shown in FIG. 2 but an illustrative example is detailed in FIGS. 11 and 12) prevents downward movement of the brush 12. Also in FIG. 2, the safety catch 22 is disengaged with respect to the ledge 30 of the upper beam 18, as will be further discussed below.

The movement of the beam 14, safety catch 22 and upper beam 18 also exposes several additional aspects. The upper mount block 20 is shown to engage with the lower mount block 16 with a fork 36. The upper mount block 20 can also be attached to the lower mount block 16 using any suitable attachment mechanism, such as a bolt or screw, or the like,

US 7,141,906 B2

7

for example, as shown and discussed below with reference to FIG. 15B. In other embodiments the upper mount block 20 and lower mount block 16 can be fused together or provided as a single piece.

Referring to FIG. 2, a conductor strap 34 is also illustrated, the conductor strap 34 being placed optionally over an insulator 35 which insulates the lower mount block 16. The insulator 35 prevents current passing via the brush 12 from passing through the lower mount block 16. The conductor strap 34, when the device is "engaged" as shown in FIG. 1, contacts the terminal 28, providing a conductive path from the brush 12 through the brush conductor 26, the terminal 28 and finally the conductor strap 34. The conductive path thus avoids the brush box 10 as well as the beam 14, lower mount block 16, upper mount block 20, and upper beam 18.

To further control current passage, various elements including in particular the beam 14 and brush box 10 may in some embodiments be constructed of or coated with nonconductive materials. Also, in some embodiments, the brush spring 24 may likewise be coated or constructed to prevent current passage.

Actions to disengage the device, changing the configuration from that of FIG. 1 to that of FIG. 2 may, in several embodiments, include overcoming an over-center force. Such a design can impede unwanted disengagement (the safety catch 22, included in some embodiments, further impedes unwanted disengagement). Some examples of an over-center force concept are detailed below in FIGS. 13A–13C and 17A–17C.

FIG. 3 illustrates a perspective view of an example brush and spring for use with several embodiments. The brush spring 24 includes a spring hook 50, a tab 52, and a spring coil 54. The brush 12 includes a brush top 55. The spring coil 54 is shaped and configured to press against the brush top 55. The brush conductor 26 extends around the spring coil 54 and is adapted to couple with a terminal such as the terminal 28 illustrated in FIG. 10. In some embodiments, the brush top 55 may include a coating or dielectric device for preventing current passage through the spring coil 54.

FIGS. 4A–4B illustrate perspective views of attachment of a spring similar to that shown in FIG. 3 to an illustrative beam of an example brush holder assembly. FIG. 4A shows a brush spring 24 coupled to a beam 14. The spring hook and tab shown in FIG. 3 are hidden beneath a notch 57 in the beam 14. The spring is shown in an extended, or partially uncoiled configuration, as though engaging a brush, but the brush is not shown so a better view of the spring can be made. FIG. 4A also illustrates the hinge pin holes 58, which provide one location for a pivot line. In the illustrative example shown, the hinge pin holes 58 correspond to pivot line Y shown in FIGS. 1 and 2. The beam 14 includes a brush catch notch 56, which may optionally be included to provide a safety feature further described below with reference to FIGS. 11 and 12. Also shown is a terminal catch 106, which may be used in attaching a terminal to the beam 14, as illustrated in FIG. 4C.

The brush is omitted in FIG. 4A, but it can be seen from viewing both FIG. 3 and FIG. 4A that the brush (FIG. 3) would lie in front of the beam 14 (FIG. 4A), with the spring coil 54 engaging the brush top 55 (FIG. 3), such that the brush 12 (FIG. 3) would extend beyond the bottom end 59 (FIG. 4A) of the beam 14 (FIG. 4A). The spring coil 54 is adapted to allow for continued pressure against the brush top 55 (FIG. 3) as the brush 12 (FIG. 3) wears away during use.

8

Thus the spring coil 54 winds in on itself as the brush top (FIG. 3) moves toward the bottom end 59 (FIG. 4A) of the beam 14 (FIG. 4A).

The notch 57 is sized and shaped to receive the spring hook (not shown) in order to attach the brush spring 24 to the beam 14. By attaching the brush spring 24 to the beam 14, there is no need to supply a back plate to the device, as is often used in other brush holders. Such a construction allows the spring 24 to bias the brush 12 against a conductive surface 13, and allows the brush to slide up and down within the box.

FIG. 4B illustrates a cut-away perspective view of a portion of a beam 14 and brush spring 24 corresponding to an opposite side of that shown in FIG. 4A, focusing primarily on the area of notch 57. The brush spring 54 extends through the notch 57 in a region corresponding to the spring hook 50. The tab 52 extends into an opening 60 on the back side of the beam 14 to secure the brush spring 24 to the beam 14. Other embodiments may utilize other attachment mechanisms. For example, the spring may be provided with one or more holes replacing and in the same general location as the tab, and one or more attachment mechanisms could be placed through the one or more holes to secure the brush spring 24 to the beam 14. The attachment mechanism may be any of a variety of securing mechanisms, for example, a rivet, a bolt, a screw, a sheet metal screw, an adhesive, solder, weld, and/or spot weld, or the like, or other mechanism.

In some embodiments, the attachment mechanism may be an easily removed or detached attachment apparatus, so that the brush spring 24 may be quickly and easily replaced. In other embodiments, the brush spring 24 and attachment mechanism may be more permanent, but may be provided such that the beam 14 is not damaged in removing the brush spring 24 and attachment mechanism. One example of such an embodiment would be to make the beam 14 of a material that does not melt or exhibit plastic deformation until a very high temperature, with the brush spring 24 and attachment mechanism of lower temperature deformation/melting point materials, so that heating in a furnace or by use of a torch could allow ready detachment of the brush spring 24 without damaging the beam 14. In still other embodiments, the brush spring 24 may be permanently attached to the beam 14, and the beam 14 may be reused only a few times until the brush spring 24 is no longer satisfactory for use, at which time the beam 14 with the brush spring 24 may be discarded.

In an alternative embodiment, a brush spring may be provided which, rather than coiling in on itself as the brush spring 24 of FIG. 4A does, will instead extend outward. For example, a spring may be provided to attach to the beam 14 on top of the brush 12, with the spring provided in a compressed state and expanding to push the brush 12 downward. More than one spring may be provided on the same device, too.

Also illustrated in FIG. 4B are several brush posts 64. In some embodiments, the box posts 64 are provided as a part of the beam 14 to allow for removal and cleaning or replacement of a brush box 10 such as the brush box 10 shown in FIGS. 1 and 2. The box posts 64 may allow for removal and cleaning or replacement of a brush box 10 when a new brush 12 is supplied to the brush holder. In other embodiments, the box posts 64 may include threading, pinholes or keyways or the like to allow for a securing apparatus such as a bolt, pin or key to be used in securing the brush box 10. In other embodiments, the box posts, or other such structure, do not allow removal of the brush box. For example, in some embodiments a brush box

US 7,141,906 B2

**9**

10 may be secured to the beam **14** by welding or the like, either with or without the box posts **64**.

A pivot pin **62** is also shown in FIG. **4**B. The pivot pin **62** may provide a pivot line corresponding to pivot X shown in FIGS. **1** and **2**. For example, the pivot pin **62** may mate with and slide in a groove **38** as shown in FIGS. **2** and **14**. An alignment pin **63** is shown as well. The alignment pin **63** serves to align the lower beam to the lower mount, for example, such that the upper locking pin **192** of a upper beam (shown in FIG. **16**B) aligns with the pin gap **186** in the upper mount block **20** (shown in FIG. **15**A), as will be discussed in more detail below. The alignment pin **63** is adapted to fit into relief groove **150** shown in FIG. **14**.

FIG. **4**B illustrates the "channel-like" nature of the example beam **14**. The beam **14** is designed so that a lower mount block such as the lower mount block **16** illustrated below in FIG. **14** may be sized and shaped to slide into a channel **68** defined by the beam **14**. The channel **68** allows the lower mount block **16** (FIG. **14**) to have a regular shape, allowing for several mount holes **96** (FIG. **14**) through a solid portion of the lower mount block **16** (FIG. **14**) so that secure attachment of the lower mount block **16** is readily performed. Such design also saves space. For example, the mount holes **96** (FIG. **14**) can be provided beneath the brush and brush box which attach to the beam **14**, rather than being next to or behind these items. This allows for closer brush placement or, in other terms, higher brush density, such that more or additional brush holders can be installed and higher amperage capacity can be achieved, if desired. The compact design also may allow for use of the replaceable brush holder designs in smaller generators and motors.

FIG. **4**C illustrates another aspect of the beam **14**, this time focusing on the removable attachment of a terminal **28** to the beam **14**. As shown, the terminal **28** includes a stop tab **104** which can slide into the terminal catch hole **106**. Because a simple stop tab **104** is used to attach the terminal **28**, the terminal **28** may be easily removed and replaced whenever desired, or whenever a brush, box, spring or other part is replaced. In some embodiments, the terminal **28** is permanently attached to the brush conductor **26**, and therefore, a new terminal is used anytime a new brush is inserted. In other embodiments, the terminal may be releasibly connected to the brush conductor **26**, and can be replaced without a new brush, or the brush can be replaced without a new terminal. Because the terminal **28** conducts current, it may be a target for corrosion and accumulation of debris. Also, because the terminal **28** must securely contact a brush conductor **26**, it may be advantageous to include a new terminal **28** often. Additionally, in some embodiments, portions of the beam **14** that come in contact with the terminal may be made of, include, or be coated with an insulating material to prevent the flow of current from the terminal to the beam **14**. Some examples of insulating material can include plastics, such as Teflon, ceramics, and the like, or other insulating material.

In other embodiments, the brush conductor **26** (not shown) may include an attachment apparatus which attaches to the beam **14** instead of a separate terminal, with the brush conductor **26** (not shown) also including a design allowing it to contact and conduct current to/from a conductor strap (also not shown).

Also illustrated quite clearly in FIG. **4**C are two safety catch attachment pins **107**, which can be used for attaching a safety catch **22** (FIG. **1**) to the beam **14**. The safety catch attachment pins **107** may be of any suitable design and material for attaching to safety catch **22** (FIG. **1**). The safety catch attachment pins **107**, while included in some embodi-

**10**

ments, may be excluded in others, since several embodiments also use an over-center force mechanism to maintain the brush assembly in an engaged configuration.

FIG. **5** illustrates a perspective view where several elements of the illustrative embodiment have been omitted to highlight a conductive path. Shown are several conductive elements as coupled together when an example mounting bracket is in an engaged position relative to a mount block. The conductive path includes a brush **12** which, in use, would contact a conductive surface such as a collector ring or a commutator. From the brush **12**, current is conducted through a brush conductor **26** to a terminal **28**. The terminal **28** includes a terminal leaf **70** that conducts current to a strap leaf **72** of a conductor strap **34**. Each element of the conductive path illustrated in FIG. **5** may be made of any of a number of conductive materials including, for example, brass, copper, or silver, but any other conductive material will suffice.

In some embodiments, the terminal **28** and/or the conductor strap **34** can include material or structure adapted or configured to provide a connecting force between the terminal and the conductor strap **34**. For example, the terminal **28** and/or the conductor strap **34**, or both, can include or be made of a spring material that is configured to bias one or more portions of the terminal **28** and the conductor strap **34** into electrical connection with each other when the mounting bracket is in an engaged position relative to a mount block. For example, in the embodiment shown, the terminal **28** includes two leafs **70** that extend outward from the terminal to provide a generally unshaped structure. The conductor strap **34** also includes two leafs **72** that form a generally unshaped structure. The leafs **70**, or portions thereof, can be made of or include a portion of which is a spring material, such as a spring polymer, spring metal, for example spring copper or the like. The leafs **70** can be shaped or configured such that at least a portion of the space between the leafs **70** is smaller than the distance between the outer surfaces of the leafs **72** of the conductor strap **34**. Due to the shape, and the use of a spring material, when the leafs **70** come into contact with the leafs **72**, the leafs **70** are spread apart slightly to engage the leafs **72**. However, due to the spring nature of the leafs **70**, they bias themselves toward the leafs **72** to provide a connecting force between the terminal and the conductor strap **34**. It should be understood that in other embodiments, only one leaf **70** could be used, or more than two leafs **70** could be used, and a similar biasing force can be created. It should also be understood that the leafs **72** of the conductor strap **34** could also be made of a spring material and be adapted or configured to provide an outward biasing force against the leafs of the terminal. In yet other embodiments, the leafs **70** of the terminal could be adapted and configured to fit within the leafs **72** of the conductor strap **34**, and to provide an outward biasing force, and/or the leafs **72** of the conductor strap **34** could be adapted and configured to provide an inward biasing force.

FIG. **6** illustrates a perspective view similar to that of FIG. **5** except that the conductive elements are shown including a disconnection between certain elements because the mounting bracket is in a disengaged position relative to the mount block. As illustrated, the conductive path including the brush **12**, brush conductor **26**, terminal **28**, terminal leaf **70**, strap leaf **72** and conductor strap **34** is broken. When disengaged, the terminal leaf **70** does not contact the strap leaf **72**. By breaking the conductive path during disengagement, the possibility of arcing between a brush **12** and a commutator or other moving conductive surface during removal or replacement of the brush **12** is reduced. A further

US 7,141,906 B2

11

safety concern is the possibility of current conduction or shorting during servicing of the brush and/or brush holder. By allowing a first step current disconnection as shown and further illustrated below, the likelihood of current conduction or shorting can be reduced.

In one embodiment, the lock pin 63 (FIG. 4B) forces the beam 14 (FIG. 4B) up as soon as disengagement begins. Then, separation of the terminal leaf 70 from the strap leaf 72 occurs before the brush 14 is separated from an adjacent conductive surface. This combination of movements allows for interruption of current flow before separation between the brush 12 and an adjacent conductive surface, preventing arcing between the brush 12 and the conductive surface. This step is useful because it has been found that such arcing can create a fire hazard and, more often, can create a pit or deformation on a commutator or collector ring surface. Any such pit or deformation will be magnified by further use of the brush 12 on the surface and can require expensive and difficult repairs.

FIG. 7 illustrates a perspective view showing a portion of the perspective view of FIG. 2 including a safety locking apparatus. A beam 14 is shown with a safety catch 22 attached at a safety catch attachment pin 107. As shown, part of the safety catch 22 engages a ledge 30 of the upper beam 18 at place A. While both the upper beam 18 and the beam 14 will pivot outward when the device is moved to a disengaged position (i.e. a transition from the configuration of FIG. 1 to the configuration of FIG. 2), the beam 14 and safety catch 22 pivot on a greater radius, so that outward movement forces the safety catch 22 against the ledge 30, preventing movement. A removal tool such as that illustrated in FIGS. 8A–8B can include a safety catch release which fits through the notch 78 of the safety catch 22, pushing the safety catch 22 away from the upper beam 18 so that the safety catch 22 is cleared of the ledge 30. Once cleared of the ledge 30, the safety catch 22 will not impede a transition from engaged to disengaged configurations.

FIGS. 8A–8B illustrate perspective views of a removal apparatus for use with several embodiments. Referring to FIG. 8A, a removal tool 80 includes a handle 82, which may include or be made entirely of an insulator to prevent conduction of electricity to the hand of a worker sent to remove, replace or otherwise service a brush, brush holder, brush spring, brush box, terminal, collector ring, commutator, or conductive surface. While such insulation may be omitted, the likelihood of debris and/or dust creating additional conductive paths throughout a brush holder is possible, so that an additional insulator in the handle 82 may be advisable. Further, such insulation, from the perspective of a worker maintaining the brush holder, may increase confidence.

The removal tool 80 also includes a release tab 84. The release tab 84 may be a spring-loaded device which couples with a spring loaded catch pin 92 (FIG. 8B) that, in turn, can couple with a notch as shown, for example, in FIG. 15B. A safety catch release 86 is also shown, but is better viewed in FIG. 8B.

FIG. 8B illustrates another perspective view of the removal tool 80. The release tab 84 is connected to a catch pin 92 such that, when the release tab 84 is pulled, the catch pin 92 is retracted. Lacking a force on the release tab 84, the catch pin 92 is in a spring-loaded default position, projecting out from the underside of the removal tool 80.

Also illustrated is a safety tab release 86 including a ledge groove 88 and a leading edge 90. Referring now to both FIG. 7 and FIG. 8B, the leading edge 90 (FIG. 8B) is sized and configured to slide past the opening of a notch 78 (FIG. 7)

12

on the safety catch 22 (FIG. 7). The leading edge 90 (FIG. 8B) is aligned with the notch 78 (FIG. 7) by the sliding interaction between the ledge 30 (FIG. 7) and the ledge groove 88 (FIG. 8B). As the leading edge 90 (FIG. 8B) is passed toward the safety catch 22 (FIG. 7) along the surface of the upper beam 18 (FIG. 7), the leading edge 90 (FIG. 8B) encounters and passes through the notch 78 (FIG. 7).

In one embodiment, the leading edge 90 (FIG. 8B) may be shaped or configured so that, as the notch 78 (FIG. 7) is entered and passed, the safety catch 22 (FIG. 7) is forced outward to finally clear the ledge 30 (FIG. 7). Alternatively, the notch 78 (FIG. 7) may be configured so that, as the leading edge 90 (FIG. 8B) passes therethrough, the safety catch 22 (FIG. 7) is forced outward to clear the ledge 30 (FIG. 7). For example, the leading edge 90 (FIG. 8B) and/or the notch 78 (FIG. 7) may include one or more angled or curved surfaces which, when the leading edge 90 (FIG. 8B) passes the notch 78 (FIG. 7), comes into contact with a surface on the other of the leading edge (FIG. 8B) or notch 78 (FIG. 7) and, on further passage, forces the safety catch 22 to bend or curve outward.

FIG. 9 illustrates a perspective view of the interaction between a removal apparatus similar to that of FIGS. 8A and B, with a safety locking apparatus similar to that of FIG. 7 during a disengagement manipulation. As shown, the ledge groove 88 has engaged the ledge 30 (FIG. 7). Meanwhile, the catch pin 92 (FIG. 8B) is engaged with the pin seat 194 (FIG. 16B) of the upper beam 18. Pulling on the release tab 84 (for example, pulling with a thumb) can disengage the catch pin 92 from the pin seat 194. The safety catch release 86 is engaged with the safety catch 22, releasing the safety catch 22 from engagement with the ledge 30 (not shown) on the upper beam 18.

Also shown in FIG. 9, and relevant to description with respect to FIGS. 5 and 6 is a conductive strap 34, which is made of a conductive material. The conductive strap 34 overlies an insulator strap 35, which helps prevent current from flowing throughout the rest of the device, isolating the current carrying material of the conductive strap 34. The conductive strap 34 may be shaped as shown in FIGS. 2, 5 and 6.

FIG. 9 also illustrates several mount holes 96. The mount holes 96 may pass over a mount base on which the lower mount block 16 may be mounted. For example, a pair of threaded bolts may pass through the mount holes 96, with nuts and/or washers placed on the bolts to secure the lower mount block 16 to a mount base. One example of such an embodiment is shown in FIG. 15B. In other embodiments, a welded, keyed, pinned or other attachment scheme may be used to secure the lower mount block 16 to a mount base near a moving conductive surface or in position to move relative to a conductive surface.

FIG. 10 illustrates a perspective view of a terminal for use in several embodiments. The terminal 28 includes a conductor receiver 100, stop arm 102, stop tab 104, and terminal leaf 70. The terminal 28 may be formed of a conductive material by any suitable process. In an illustrative example, a piece of sheet metal such as copper may be cut and bent into the illustrated shape.

The terminal 28 is adapted to slide into place on a beam 14. Referring to FIG. 4A; the stop arm 102 may be passed over a top portion of the beam 14 until the stop tab 104 (FIG. 10) reaches the terminal catch 106 (FIG. 4A) and slips into place through the terminal catch 106 (FIG. 4A). Once properly in place, the terminal leaf 70 will extend down to a lower side of the beam 14 as diagrammed in FIGS. 5 and 6. When the device is in an engaged configuration, the

US 7,141,906 B2

**13**

terminal leaf **70** contacts the conductive strap **34** (FIG. **9**). As a result of the slip-on nature of the terminal **28**, it may be replaced as needed, without requiring that the beam or other parts of the brush holder be discarded. Further, the slip-on or snap-type terminal **28** used in several embodiments does not require additional welds or screws for attachment, simplifying both replacement and removal of the terminal **28**.

The conductor receiver **100** may be sized or otherwise adapted to provide good contact with a brush conductor **26** (FIG. **3**). For example, the inside sizing of the conductor receiver **100** may be such as to apply compression to a brush conductor **26** (FIG. **3**). In additional embodiments, a set screw, compression screw, soldering location, winding post, snap-down piece, spring, or other apparatus may be included to augment or replace the conductor receiver **100** and improve or more strongly secure contact with the brush conductor **26** (FIG. **3**).

FIG. **11** illustrates a cut-away view of an illustrative brush-catch mechanism used in some embodiments, with the brush-catch mechanism retracted. As shown, a beam **14** is engaged with respect to a lower mount block **16**. The surface of the beam **14** is shown with lines included to further illustrate features including a guide tab **116** and a brush catch notch **56**. A brush box, which would otherwise conceal the brush catch notch **56**, has been cut-away to expose the brush catch mechanisms.

A brush catch **110** is engaged with a brush catch spring **112** in the brush catch notch **56**. A brush release tab **114** is a part of the lower mount block **16**. The brush release tab **114** may be created or attached by any suitable method. The guide tab **116** is a part of the beam **14** as further illustrated, for example, in FIG. **4**A. While the beam **14** and the lower mount block **16** are in the engaged configuration (i.e. the configuration shown in FIGS. **1** and **11**), the brush release tab **114** presses against the brush catch **110** to prevent the brush catch **110** from extending above the guide tab **116** and engaging the brush **12**.

FIG. **12** illustrates extension of a brush-catch mechanism similar to that shown in FIG. **11** to engage a brush during retraction of the beam with respect to the lower mount block. As shown in FIG. **12**, the beam **14** and lower block mount **16** have been disengaged (i.e. the configuration shown in FIG. **2**). Once disengaged, the beam **14** may be retracted with respect to the lower mount block **16**, revealing a groove **38**. During the retraction, the brush catch **110** moves away from the brush release tab **114**, allowing the brush catch spring **112** to press the brush catch **110** to an extended position, so that the upper end **118** of the brush catch **110** engages the brush **12**, preventing the brush **12** from moving downward. The guide tab **116** also stops the brush catch **110** at a most-extended position, holding the brush catch **110** engaged with the brush **12** until a force is applied to the brush catch **110** to release the brush **12**. For example, after withdrawal of the beam **14** with the brush **12**, a technician may use a screwdriver or other tool to press against the brush catch **110**, retracting the brush catch **110** and releasing the brush **12**.

In other embodiments, other brush catch mechanisms may also be used to prevent the brush **12** from falling out of the bottom of the brush box **10**. For example, referring to FIG. **1**, the brush conductor **26** may be sized and shaped so that the top end of the brush **12** cannot pass beyond the bottom of the box **10** when the brush conductor **26** is coupled to the terminal **28**. In another example, referring now to FIG. **3**, a loop attached to the brush top **55** may pass through the spring coil **54** (the loop may be tied or clipped into place), with the spring coil **54** pushing on the brush **12** until the

**14**

spring coil **54** reaches the spring hook **50**, the loop then holding the brush **12** in place and preventing further movement forward.

FIGS. **13**A–**13**C illustrate highly schematic views highlighting an over-center locking mechanism used in several embodiments. FIG. **13**A illustrates a brush holder including a brush box **10**, a lower mount **130**, beam **132**, a removal receiver **134**, and a groove **136**. Hinge locations X, Y, and Z are also shown, hinge X including a pin which may slide with respect to the lower mount **130** in the groove **136** but which is fixed at one end of the beam **132** (for example, hinge pin **62** shown in FIG. **4**B, which may slide in groove **38** shown in FIG. **2**). Hinge Y is a hinge between the beam **132** and the removal receiver **134**, while hinge Z is a hinge between the removal receiver **134** and the lower mount **130**. The configuration in FIG. **13**A is fully disengaged, with the brush box **10** tilted and pulled away from the bottom end of the lower mount **130**.

FIG. **13**B illustrates an intermediate stage of a movement from the disengaged configuration of FIG. **13**A to the engaged configuration shown in FIG. **13**C. At this intermediate stage, the slidable hinge X has slid to the end of the groove **136** near the bottom of the lower mount **130**. The hinge Y has not completely straightened out to reach a 180 degree configuration, but both ends of the jointed member including the beam **132** and removal receiver **134** are now fixed. Therefore, an additional "over center" force must be applied to force the beam **132** and removal receiver **134** into the configuration shown in FIG. **13**C.

As shown in FIG. **13**C, the beam **132** and removal receiver **134** are now in a straight configuration and the device is completely engaged. In this engagement, there will be tension between stretching forces along the length of the lower mount **130** applied by the beam **132** and removal receiver **134** and compressive forces on the beam **132** and removal receiver **134** applied by the lower mount **130**, due to the over center force noted with respect to FIG. **13**B. In effect, the configuration of FIG. **13**C is reached by jamming or forcing the components from the configuration of FIG. **13**B to that of FIG. **13**C. This over center force also acts to keep the pieces engaged as shown in FIG. **13**C, and inclusion of a safety latch device as illustrated in FIG. **7**.

For some embodiments, when the hinge Y is in the configuration as shown in FIG. **13**B, the conductive elements of the brush holder may be separated to prevent current flow, as more completely shown in FIGS. **5** and **6**. Note that the brush box **10**, however, in FIG. **13**B, remains nearly to the bottom of the beam **130** and is in almost the same position as that shown in FIG. **13**C, where the brush holder is engaged and current is flowing. As such, the current may be stopped without a brush in the brush box **10** being disengaged from an adjacent commutator, preventing commutator damage due to arcing during removal.

FIG. **14** illustrates a perspective view of a lower mount block for use in several embodiments. The lower mount block **16** includes a groove **38** into which a pin or pins from a beam may be placed. A relief groove **150** is included for the alignment pin **63** of the beam, and can improve the stability and direction of both insertion and withdrawal. For the example lower mount block **16**, the relief groove **150** is more shallow than the groove **38**, so that, for example, a shorter alignment pin **63** may engage either groove **38**, **150** while a longer primary pin may engage only the deeper groove **38**. The alignment pin **63** can also serve to align the lower beam to the lower mount, for example, such that the upper locking pin **192** of a upper beam (shown in FIG. **16**B) aligns with the pin gap **186** in the upper mount block **20**

US 7,141,906 B2

15

(shown in FIG. 15A), as will be discussed in more detail below. A brush release tab 114 is also shown, and may function in accordance with the description of FIGS. 11 and 12. Several mount holes 96 may include threading or other elements that allow for attachment to a mount base.

The lower mount block 16 may include a fork seat 142 for receiving a fork of an upper mount block such as the upper mount block 20 as shown in FIG. 15. The fork seat 142 provides stability to the upper mount block. The upper mount attachment hole 140 allows for securing the upper mount block to the lower mount block, for example, by welding or by using a threaded screw or bolt, or other attachment mechanism. The upper mount block is shown in FIG. 15A including a bore for placing a bolt into the attachment hole 140.

The lower mount block 16 may be mounted on any number of surfaces. Of particular use may be the fact that lower mount block 16 can be mounted onto a flat surface. This means that the lower mount block 16 can be retro-fitted onto existing brush riggings. For example, an existing rigging may include a number of bolts and other elements, which may be removed and/or cut off of the existing rigging, leaving behind a flat surface. The lower mount block 16 may then be mounted onto the remaining flat surface by, for example, welding it into place. Alternatively, any remaining flat surface may be fitted with two bolts, properly placed, to which the lower mount block 16 may be attached. Because the present embodiment can be separated into multiple pieces, with the lower mount block 16 being the only portion that must be "fixed" to a location, attachment steps are simplified, because other parts can be set aside until the lower mount block 16 is placed and secured.

FIG. 15A illustrates an upper mount block 20 which can be attached to the lower mount block illustrated in FIG. 14. The upper mount block 20 includes a fork 36 which can enter the fork seat 142 of the lower mount block 16 shown in FIG. 14. Also illustrated is the counterbored attachment hole 182, which may be aligned with the attachment hole 140 of the lower mount block 16 of FIG. 14. An upper locking pin hole 184 and pin gap 186 are adapted and shaped to function with upper locking pin 192 of a upper beam such as that shown in FIG. 16B. The pin gap 186 allows complete removal of the upper beam from the upper mount block, as the upper locking pin 192 (FIGS. 16A and B) is shaped and sized to pass through the pin gap 186. The alignment pin 63 (FIG. 4B) can engage the groove 38 and serve to align the lower beam to the lower mount, for example, such that the upper locking pin 192 of a upper beam (shown in FIGS. 16A and B) aligns with the pin gap 186 in the upper mount block 20 (shown in FIG. 15A).

FIG. 15B illustrates an exploded view of how the upper mount block 20 of FIG. 15A can be attached to the lower mount block 16 of FIG. 14. A threaded bolt 183, or other such attachment mechanism, can be inserted through the attachment hole 182 in the upper mount block 20, and is aligned with and extends into and engages the attachment hole 140 of the lower mount block 16. The attachment hole 140 can include internal threads that engage the threaded bolt 183, and the bolt can be tightened down to connect the upper mount block 20 to the lower mount block 16. In some embodiments, additional structures 185, such as one or more Belleville washers, disc springs, or the like, can be disposed about the bolt 183 between the upper mount block 20 and the lower mount block 16 to provide a degree of separation force between the upper mount block 20 and the lower mount block 16. In some such embodiments, adjustment to the overall length of the upper mount block 20 and the lower

16

mount block 16 when they are connected together can be made. For example, the bolt 183 may be loosened such that the structure 185 applies a separation force between the upper mount block 20 and the lower mount block 16 such that the overall length of the upper mount block 20 and the lower mount block 16 when they are connected is longer. Alternatively, the bolt may be tightened to compress the structure 185, and thereby shorten the overall length of the upper mount block 20 and the lower mount block 16 when they are connected. Such adjustment may allow for a customized fit with beam 14 and upper beam 18, and may allow for the adjustment of force needed to put the mount in an engaged position.

In some other embodiments, additional structures 185, such as one or more Belleville washers, disc springs, or the like, can be disposed about the bolt 183 between the upper mount block 20 and the head of the bolt 183 to provide a degree of separation force between the upper mount block 20 and the bolt head. The bolt can then be tightened down against the additional structures 185, such as Belleville washers, disc springs, or the like, such that the additional structures 185 provide a predetermined level of force against the upper mount block 20. In such embodiments, when the additional "over center" force is applied to force the holder into an engaged position (for example, the beam 132 and removal receiver 134 into the configuration shown in FIG. 13C) the stretching forces along the length of the upper and lower mount blocks 16 and 20 and compressive forces on the beam 14 and upper beam 18 can be somewhat absorbed by the additional structures. 185. For example, some embodiments may include a stack of Belville washers, for example, in the range of about 1 to 8, or more Belville washers disposed between the upper mount block 20 and the head of the bolt to provide an automatic or controlled tensioning force. In some embodiments, the controlled force can be in the range of about 100 to about 400 pounds.

FIG. 15B also illustrates one embodiment of how the mount holes 96 may pass over a mount base 41 on which the lower mount block 16 may be mounted. For example, a pair of threaded bolts 43 may pass through the mount holes 96, with nuts 45 and/or washers placed on the bolts 43 to secure the lower mount block 16 to a mount base. As indicated above, in other embodiments, a welded, keyed, pinned or other attachment scheme may be used to secure the lower mount block 16 to a mount base near a moving conductive surface or in position to move relative to a conductive surface. The bolts 43, nuts 45, or other such structure may include, be coated with, or be made of an insulative material to help prevent current passing via the brush 12 from passing through the lower mount block 16.

FIGS. 16A–16B illustrate perspective views of a upper beam which couples to a removal tool as in FIG. 8. Referring to FIG. 16A, the upper beam 18 may include a ledge 30, a hinge pin hole 190, and an upper locking pin 192. The hinge pin hole 190 may be included to correspond to pivot line Y illustrated in FIGS. 1 and 2. The pivot line Y therefore pivots between a hinge pin hole 190 of the upper beam 18 and a hinge pin hole 58 on the beam 14 shown in FIG. 4A. Ledge 30, as discussed above, performs the function of providing a location for the removal tool of FIGS. 8A–8B to "grasp" the upper beam 18 as well as providing a location against which the safety catch 22 can press to prevent removal without the proper removal tool.

FIG. 16B provides an additional perspective view of the upper beam 18, again showing the upper locking pin 192, ledge 30 and hinge pin hole 190. Also highlighted is a pin seat 194. The pin seat 194 is designed so that the catch pin

US 7,141,906 B2

17                                                              18

**92** of the removal tool **80** shown in FIG. **8**B can be inserted therein. Once inserted, the catch pin **92** (FIG. **8**B) locks the removal tool **80** (FIG. **8**B) to the upper beam **18** (FIG. **16**B), until the release tab **84** (FIG. **8**B) is moved to pull the catch pin **92** (FIG. **8**B) out of the pin seat **194** (FIG. **16**B).

FIGS. **17**A–**17**C illustrate highly schematic views of an alternative over-center design in which the brush does not tip. The illustrative embodiment includes a lower mount **200** on which a brush **202** connected to slide **204** may be mounted. The brush **202** may be slidingly mounted on the slide **204**. For example, the slide **204** or the brush **202** may include a spring or other mechanism to push the brush forward against an adjacent commutator (not shown). A beam **206** connects with slide **204** at hinge T. A removal receiver **208** connects with the beam **206** at hinge S. The removal receiver **208** may be adapted to receive a handle or removal tool such as the removal tool shown in FIGS. **8**A–**8**B. The removal receiver in turn connects to a rear mount **210** at hinge R. The rear mount **210** and mount **200** may be provided as a single piece, or may be several pieces affixed or joined together. In some embodiments, the hinge R may be a removable hinge or may be adapted to decouple, so that the removal receiver **208** can be disconnected from rear mount **210**.

FIG. **17**A illustrates the example embodiment in a disengaged configuration. In use, the mount **200** would be near or adjacent to a conductive surface (not shown), and there may be relative movement between the bottom mount **200** and the conductive surface (not shown). The mount **200** is illustrated as including coupling catch **212**, which is shaped to receive the bottom of the beam **206** at hinge T.

In FIG. **17**B, the angle at hinge S has changed so that the bottom of the beam **206** now encounters the coupling catch **212**. The slide **204** may slide past the coupling catch, or two coupling catches **212** may be provided, one on each side of the slide **204**. As shown in FIG. **17**B, the beam **206** and removal receiver **208** are mechanically at a point where neither end can move farther away from the other. In order to reach the fully engaged configuration of FIG. **17**C, an over-center force must again be applied to force the device into the final configuration of FIG. **17**C.

From FIG. **17**B to FIG. **17**C, the bottom of the beam **206** at hinge T cannot move forward so the slide **204** does not move, and, therefore, the brush **202** remains in the same location. During a removal step, therefore, the brush **202** would remain engaged with an adjacent conductive surface, while hinge S would be moved from a first, nearly straight, angle, to the lesser angle of FIG. **17**B. This would again allow disengagement of the conductive circuit within the brush holder before the brush **202** disengages a conductive surface, protecting the conductive surface and brush **202** from damage due to arcing.

While the above embodiments are often described in terms of removing or replacing a brush, in some embodiments the primary use of these devices may be to allow a maintenance worker to repair, monitor or otherwise service a commutator, collector ring, or other conductive surface which a brush is designed to engage. For example, not only do brushes wear down over time, but commutators engaged by brushes also exhibit degradation due to wear. It may be useful to easily or reversibly disengage a brush from a commutator to determine the extent of wear and perform repairs.

Additionally, different embodiments of the invention can be suited and sized for use in the particular electrical device in which they are to be incorporated. For example, some embodiments are suited and sized for use in large industrial

electrical generators or motors. Some embodiments are particularly well suited and sized for use in power plants, for example power plants having a capacity in the range of about 0.5 to about 900 megawatts, and in some embodiments, power plants having a capacity in the range of about 300 or greater. It should be recognized, however, that the invention is not limited to use in such embodiments.

Those skilled in the art will recognize that the present invention may be manifested in a variety of forms other than the specific embodiments described and contemplated herein. Accordingly, departures in form and detail may be made without departing from the scope and spirit of the present invention as described in the appended claims.

What is claimed is:

**1**. A brush holder assembly for holding a brush having a conductive element, the brush holder assembly comprising:
   a first portion mountable to a base, the first portion including a stationary brush release; and
   a second portion separable from the first portion, the second portion including a brush catch for selectively engaging or disengaging the brush;
   wherein the brush catch has a first position wherein the brush catch is engaged with the brush and a second position wherein the brush catch is disengaged from the brush;
   wherein the stationary brush release is in contact with the brush catch when the brush catch is in the second position said stationary brush release includes a projection extending from the first portion.

**2**. The brush holder assembly of claim **1**, wherein the projection is a brush release tab.

**3**. The brush holder assembly of claim **1**, wherein the brush catch is a lever rotatably actuated between the first position and the second position.

**4**. The brush holder assembly of claim **1**, wherein the first portion is in sliding engagement with the second portion.

**5**. The brush holder assembly of claim **1**, wherein the first portion and the second portion include complementary geometry for sliding engagement.

**6**. The brush holder assembly of claim **5**, wherein the first portion includes a pair of channels and the second portion includes a pair of projections slidably engaged with the pair of channels.

**7**. The brush holder assembly of claim **6**, wherein the pair of channels are parallel grooves.

**8**. The brush holder assembly of claim **6**, wherein the pair of projections are posts.

**9**. The brush holder assembly of claim **1**, wherein the first portion includes a first elongate channel having a longitudinal axis and a second elongate channel having a longitudinal axis, wherein the longitudinal axes are parallel.

**10**. The brush holder assembly of claim **1**, wherein the brush catch includes a spring.

**11**. The brush holder assembly of claim **1**, further comprising a handle configured to assist engagement or disengagement of the second portion with the first portion.

**12**. The brush holder assembly of claim **11**, wherein the handle is removable from the assembly.

**13**. The brush holder assembly of claim **12**, wherein the removable handle includes a spring-loaded device.

**14**. A brush holder assembly for holding a brush having a conductive element, the brush holder assembly comprising:
   a mounting block including an engagement portion;
   a beam having an engagement portion complementary with the mounting block engagement portion, wherein the mounting block engagement portion is slidably engaged with the beam engagement portion, and

US 7,141,906 B2

19

wherein the beam is slidable relative to the mounting block between a first, disengaged position and a second, engaged position;

a brush catch coupled to the beam for selectively engaging the brush; and

a brush release extending from the mounting block and configured for sliding engagement with the brush catch said brush release is a projection extending frond the mounting block.

**15**. The brush holder assembly of claim **14**, wherein the mounting block engagement portion includes an elongate channel having at least three interior walls, wherein the beam engagement portion is slidably disposed within the elongate channel.

**16**. The brush holder assembly of claim **14**, wherein the brush catch is disengaged from the brush when the mount block is in the engaged position.

**17**. The brush holder assembly of claim **14**, wherein the brush catch is engaged with the brush when the mount block is in the disengaged position.

**18**. The brush holder assembly of claim **14**, wherein the brush catch is biased to be engaged with the brush.

**19**. The brush holder assembly of claim **14**, wherein the brush catch includes a spring.

**20**. The brush holder assembly of claim **14**, wherein the brush catch is a lever disposed in a notch of the beam.

**21**. The brush holder assembly of claim **14**, wherein the brush release is fixed to the mounting block.

**22**. The brush holder assembly of claim **14**, wherein the brush release is stationary.

**23**. A brush holder assembly for holding a brush having a conductive element, the brush holder assembly comprising:

a first component mountable to a base, the first component including a mounting block having a first side, a second

20

side opposite the first side, a first elongate channel extending along at least a portion of the first side, a second elongate channel extending along at least a portion of the second side, and a non-actuatable brush release; and

a second component selectively removable from the first component, the second component including a brush catch for selectively engaging the brush and a beam having a first portion slidably disposed within the first channel and a second portion slidably disposed within the second channel, and wherein the second component is slidable relative to the first component between a disengaged position and an engaged position;

wherein the brush release is engaged with the brush catch when the second component is in the engaged position and the brush release is disengaged from the brush catch when the second component is in the disengaged position wherein the non-actuatable brush release extends from the mounting block.

**24**. The brush holder assembly of claim **23**, wherein the non-actuatable brush release slidably engages with the brush catch as the second portion is slidably disposed into the engaged position.

**25**. The brush holder assembly of claim **23**, wherein the brush catch is a lever rotatably actuated between a first position and a second position.

**26**. The brush holder assembly of claim **23**, further comprising a removable handle configured to assist engaging and disengaging the second component with the first component.

**27**. The brush holder assembly of claim **26**, wherein the removable handle includes a spring-loaded device.

\*    \*    \*    \*    \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,141,906 B2                                    Page 1 of 1
APPLICATION NO. : 11/172315
DATED                  : November 28, 2006
INVENTOR(S)      : Robert S. Cutsforth et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 10
Line 30, delete "unshaped" and insert therefor --u-shaped--
Line 32, delete "unshaped" and insert therefor --u-shaped--

Column 19
Line 8, delete "frond", and insert therefor --from--.

Signed and Sealed this

Twenty-seventh Day of March, 2007

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

**CUTSFORTH, INC.**
**Patent Owner/Appellant**

**v.**

**MOTIVEPOWER, INC.**
**Petitioner/Appellee**

**Proceeding No: IPR2013-00268**

## NOTICE FORWARDING CERTIFIED LIST

A Notice of Appeal to the United States Court of Appeals for the

Federal Circuit was timely filed on December 30, 2014, in the United States

Patent and Trademark Office in connection with the above identified *Inter*

*Partes* Review (IPR) proceeding. Pursuant to 35 U.S.C. § 143, a Certified

List is this day being forwarded to the Federal Circuit.

February 3, 2015                    Respectfully submitted,

                              Under Secretary of Commerce for Intellectual
                              Property and Director of the United States
                              Patent and Trademark Office

                              By: *Laura J. Peterson*
                              Laura J. Peterson
                              Paralegal Specialist
                              Mail Stop 8, P.O. Box 1450
                              Alexandria, Virginia 22313-1450
                              571-272-9035

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the

foregoing has been served on Appellant and Appellee this 3rd day of

February, 2015, as follows:

W. Karl Renner
Fish & Richardson P.C.
renner@fr.com
PTABInbound@fr.com

Jason A. Engel
K&L Gates LLP
jason.engel@klgates.com


Laura J. Peterson
Paralegal Specialist
U.S. Patent & Trademark Office
Office of the Solicitor
P.O. Box 1450
Alexandria, VA  22313

2

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

February 3, 2015
(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes* Review proceeding identified below:

**MOTIVEPOWER, INC.**
**Petitioner**

**v.**

**CUTSFORTH, INC.**
**Patent Owner**

**Case: IPR2013-00268**
**Patent 7,141,906 B2**

By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

*Laura J. Peterson*

*Certifying Officer*

## Prosecution History for IPR2013-00268

| Filing Date | Document |
|---|---|
| 05/06/2013 | Petition for *Inter Partes* Review |
| 05/06/2013 | Petitioner's Power of Attorney |
| 05/08/2013 | Notice of Filing Date Accorded to Petition |
| 05/14/2013 | Notice of Accepting Corrected Petition |
| 05/28/2013 | Patent Owner's Power of Attorney |
| 05/28/2013 | Patent Owner's Mandatory Notices |
| 08/06/2013 | Patent Owner's Preliminary Response |
| 11/01/2013 | Decision - Institute *Inter Partes* Review |
| 12/03/2013 | Petitioner's Motions List |
| 12/09/2013 | Scheduling Order |
| 12/10/2013 | Order - Conduct of the Proceeding § 42.5 |
| 02/06/2014 | Patent Owner's Motion to Amend |
| 02/06/2014 | Patent Owner's Response to Petition |
| 02/18/2014 | Decision - Motion to Amend Claims |
| 02/27/2014 | Patent Owner's Power of Attorney |
| 02/27/2014 | Patent Owner's Notice of Designation of Additional Back-Up Counsel |
| 04/15/2014 | Petitioner's Notice of Deposition |
| 04/16/2014 | Petitioner's Notice of Deposition |
| 04/18/2014 | Petitioner's Notice of Designation of Additional Back-Up Counsel |
| 05/06/2014 | Petitioner's Reply to Response to Petition |
| 05/06/2014 | Petitioner's Exhibit List |
| 06/27/2014 | Patent Owner's Request for Oral Argument |
| 06/27/2014 | Petitioner's Request for Oral Argument |
| 07/09/2014 | Order - Trial Hearing Notice |
| 07/30/2014 | Patent Owner's Motion for Pro Hac Vice Admission |
| 08/05/2014 | Order - Management of the Record |
| 09/16/2014 | Oral Hearing Transcript |
| 10/09/2014 | Decision - Motion for Pro Hac Vice Admission |
| 10/30/2014 | Final Written Decision |

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the

Clerk of the Court for the United States Court of Appeals for the Federal

Circuit by using the appellate CM/ECF system on April 7, 2015.

I further certify that all participants in the case are registered

CM/ECF users and that service will be accomplished by the appellate

CM/ECF system, in addition to service via email to Appellee by serving

the email address of record as follows:

> Jason A. Engel
> Alan L. Barry
> K&L Gates LLP
> jason.engel@klgates.com
> alan.barry@klgates.com
> .

Dated:  April 7, 2015            */s/ Mathias W. Samuel*
                                 Mathias W. Samuel

## **CERTIFICATE OF COMPLIANCE**

The Opening Brief for Appellant complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). The relevant portions of the Brief, including all footnotes, contain 10,458 words, as determined by Microsoft Word 2013.

*/s/ Mathias W. Samuel*
Mathias W. Samuel